[No. 14938.    In Bank. — November 30, 1892.]

FLORENCE BLYTHE, RESPONDENT, *v.* ABBIE AYRES
ET AL., APPELLANTS.

LEGITIMATION OF ILLEGITIMATE CHILD — ADOPTION — CONSTRUCTION OF SEC-
TION 230 OF CIVIL CODE. — Section 230 of the Civil Code uses the word
"adopts" in the sense of "legitimates," and is a statute of legitimation,
rather than of adoption. It applies to all illegitimate children, wherever
located and wherever born, and is to have a liberal construction, with a
view to effect its apparent object and promote justice. [Per GAROUTTE,
J., PATERSON, J., and SHARPSTEIN, J.]
ID. — CHILD DOMICILED IN ENGLAND — FATHER DOMICILED IN CALIFORNIA
— CAPACITY OF LEGITIMATION. — Section 230 of the Civil Code applies
to the case of an illegitimate child born in England of a mother who was
at all times domiciled in England, and having a natural father who was
at all times domiciled in California, though such child continuously resided
in England until after the death of the father in California. Such child
was, at all times during the life of the father, possessed of a capacity for
legitimation, under section 230 of the Civil Code of this state. [Per GA·
ROUTTE, J., PATERSON, J., and SHARPSTEIN, J.]
ID. — EXTRATERRITORIAL OPERATION OF STATE LAWS — CHANGE OF STATUS.
— The rule that state laws have no extraterritorial operation to effect

a change of *status* of a person residing in a foreign country, and who is a subject thereof, has many exceptions, and to the extent of these exceptions, a state law must be held, by its own courts at least, to have extraterritorial operation. [Per GAROUTTE, J., PATERSON, J., and SHARPSTEIN, J.]

ID. — PUBLIC ACKNOWLEDGMENT OF CHILD RESIDENT IN ENGLAND — MEANING OF "ACKNOWLEDGMENT."— The word "acknowledgment," as used in section 230 of the Civil Code, has no technical meaning, but in its ordinary acceptation means "to own or admit the knowledge of"; and where an illegitimate child, born in England and continuously resident there until after the death of the father in this state, was acknowledged by him to the mother and grandmother of the child before its birth (though never seen by him after its birth), and was, at his request, baptized and named by his surname, and was, while residing in England, acknowledged by him in this state to many persons residing here, and on many occasions, to be his child, and he was never heard to deny its paternity, the public acknowledgment of the child as his own is sufficient, within the meaning of section 230 of the Civil Code. [Per GAROUTTE, J., PATERSON, J., and SHARPSTEIN, J.]

ID. — RECEPTION INTO FAMILY — UNMARRIED MAN WITHOUT FAMILY — CONSTRUCTIVE RECEPTION. — An unmarried man residing in California, who is the father of an illegitimate child resident in England, and who is without a family into which the child could have been received, and without relations, save of the collateral line, who resided in a foreign country, may effect the legitimation of such child under section 230 of the Civil Code. [Per GAROUTTE, J., PATERSON, J., and SHARPSTEIN, J. McFARLAND, J., and DE HAVEN, J., *contra.*]

ID. — OTHERWISE TREATING CHILD AS LEGITIMATE. — Where a father has publicly acknowledged an illegitimate child to be his child, and has taken it into his family, the provision of section 230 of the Civil Code, in respect to "otherwise treating it as if it were legitimate," is satisfied if he treats it as he would naturally treat his legitimate child, and not as the majority of men in his financial circumstances would or should treat their children. [Per GAROUTTE, J., PATERSON, J., and SHARPSTEIN, J. McFARLAND, J., and DE HAVEN, J., *contra.*]

ID. — WRITTEN ACKNOWLEDGMENT OF ILLEGITIMATE CHILD — CONSTRUCTION OF SECTION 1387 OF CIVIL CODE. — The provision contained in section 1387 of the Civil Code, that "every illegitimate child is the heir of any person who, in writing, signed in the presence of a competent witness, acknowledges himself to be the father of such child," is to be liberally construed, without interpolation or elimination of any term.

ID. — INTENT AND SCOPE OF ENACTMENT — INHERITANCE BY ILLEGITIMATE CHILD DOMICILED ABROAD. — The obvious purpose and intent of the legislature in making the enactment contained in the first clause of section 1387 of the Civil Code was to entitle illegitimate children to inherit their father's estate, the same as legitimate children; and whether it be viewed as a statute of descent merely, or as affecting the *status* of the child, it applies to the inheritance of the father's estate in California by an illegitimate child domiciled in England, where the father has made the written acknowledgment required by that section.

ID. — FORM OF WRITTEN ACKNOWLEDGMENT — LETTERS SIGNED IN PRESENCE OF NON-SUBSCRIBING WITNESS. — Section 1387 of the Civil Code uses

the word "acknowledge" in its ordinary acceptation, and does not pre-
scribe any stated form of acknowledgment, nor require that it should
be specially prepared for the sole purpose of making the illegitimate
child an heir of the father, nor that the acknowledgment shall state the
fact that the child is illegitimate, nor that the witness in whose presence
it is signed must be a subscribing witness. The written acknowledg-
ment may be made in the form of letters from the father, stating the
fact of paternity of the child, signed by him in the presence of a compe-
tent witness, who need not be a subscribing witness to the acknowledg-
ment.

ID. — RE-ENACTMENT OF STATUTE JUDICIALLY CONSTRUED — DEROGATION
OF COMMON LAW — CHANGE IN RULE OF CONSTRUCTION. — The rule that
the legislature, by re-enacting without material alteration a statute
which has been judicially expounded by the highest court of the state,
must be presumed to have intended that the same words should be re-
ceived in the new statute in the sense which had been attributed to them
in the old, does not apply, where the old statute was strictly construed,
prior to the adoption of the code, because in derogation of the common
law, and the re-enactment is made part of the code which abolishes that
rule of strict construction, and provides for a liberal construction of its
provisions, with a view to effect its objects and to promote justice.

APPEAL by the "Williams heirs" from a judgment of
the Superior Court of the city and county of San Fran-
cisco declaring Florence Blythe to be the sole heir of
Thomas H. Blythe, deceased.

The court below found that the real name of the de-
ceased was Thomas H. Williams, that he had no heirs
in the direct line except the plaintiff, Florence Blythe,
and that the persons known as the "Williams heirs"
were next of kin to him in the collateral line. There
are numerous other claimants, who contest the finding
in favor of the Williams heirs, on behalf of whom briefs
were permitted to be filed upon this appeal by their
counsel as *amici curiæ*. Further facts are stated in the
opinion.

*W. S. Goodfellow, E. R. Taylor, John R. Jarboe*, and
*H. S. Brown*, for the "Williams heirs," Appellants.

Section 230 of the Civil Code deals exclusively with
*status* and personal relations, and has nothing whatever
to do with descent or distribution. (See Austin on Gen-
eral Jurisprudence, 708, 709, 712; Civ. Code, pt. III., tit.
Personal Relations; Bla. Com., tit. Classification of Law.)

The domicile of an illegitimate child is that of the mother. (Dicey on Domicile, 70–73; Story on Conflict of Laws, sec. 46; Jacob on Domicile, sec. 228.) The law of the domicile of origin must control, and the *status* which attaches to a person at the time of his birth must forever inhere in his social being until that *status* is changed by the law of the country where he is at the time domiciled. (*Ross* v. *Ross*, 4 Wils. & S. 298, per Lord Wyndford; 2 Kent's Com., 11th ed., 254; *Bell* v. *Kennedy*, L. R. 1 Sc. & Div. App. 310; *Miller* v. *Miller*, 91 N. Y. 320; 43 Am. Rep. 669; Wharton on Conflict of Laws, secs. 249–251; Story on Conflict of Laws, 8th ed., secs. 93 e, 93 r, 93 s, 105, 105 a, and note *a*, p. 142; 1 Burge's Commentaries on Colonial and Foreign Laws, 104, 106, 109; Jacobs on Domicile, sec. 32; *Woodward* v. *Woodward*, 87 Tenn. 644; 4 Phillimore's Commentaries on International Law, sec. 531; Savigny on Private International Law, 257; *Munro* v. *Munro*, 1 Rob. App. 606, per the Lord Chancellor.) Laws governing *status* operate only on the inhabitants of the country making the laws. (Dred Scott case, 16 How. 595, 597, per Curtis, J., and 563, per Taney, C. J.; *Shedden* v. *Patrick*, 5 Pat. App. 194; 1 Macq. 555; *Ross* v. *Ross*, 4 Wils. & S. 289, 295; *Smith* v. *Kelly*, 23 Miss. 167; 55 Am. Dec. 87; Wharton on Conflict of Laws, secs. 249, 251; *Foster* v. *Waterman*, 124 Mass. 592; *Ross* v. *Ross*, 129 Mass. 245; 37 Am. Rep. 321; *Scott* v. *Key*, 11 La. Ann. 232; *Succession of Caballero*, 24 La. Ann. 573.) Section 230 of the Civil Code has no extraterritorial effect. (Story on Conflict of Laws, secs. 7, 20, 23, 28, 46; Wharton on Conflict of Laws, sec. 245; *Main* v. *Messner*, 17 Or. 78; *Mott* v. *Rowland*, 33 Cent. L. J. 29, note; *Miller* v. *Miller*, 91 N. Y. 319; 43 Am. Rep. 669.) If it be conceded that section 230 of the Civil Code has extraterritorial effect, still, every provision in the statute must be strictly and rigidly followed, in order to constitute adoption. (*Ex parte Clark*, 87 Cal. 638.) To constitute a public acknowledgment under section 230 of the Civil Code, the identity of the child acknowledged with the one

begotten, received into the family, and treated as if it were his legitimate child must be established beyond a reasonable doubt. (See *Short* v. *Conlee,* 28 Ill. 225, 228; Civ. Code, sec. 1188; *Bryan* v. *Ramirez,* 8 Cal. 461; 68 Am. Dec. 340.) The letters written to the child did not constitute a sufficient acknowledgment, as the acknowledgment must be public. (See *In re Briswalter,* 72 Cal. 108; *Sharon* v. *Sharon,* 84 Cal. 434; *In re Jessup,* 81 Cal. 408.) The child was not treated as legitimate, as it did not have the care and maintenance required by the code. (Civ. Code, sec. 196.) The child must be taken into the family, if there be a family; and if there be no family, there can be no adoption. (See *Vidal* v. *Commagere,* 13 La. Ann. 517; De Coulanges's Ancient City, c. 3, 4; Maine's Early Law and Customs, c. 3, 4; *In re Jessup,* 81 Cal. 408–434.) The plaintiff, domiciled as she was, could not have been instituted as an heir under section 1387 of the Civil Code, as the object of an acknowledgment under that section is to change the *status* of the illegitimate child. (*Pina* v. *Peck,* 31 Cal. 359; *Abney* v. *Deloach,* 84 Ala. 393; *Russell* v. *Russell,* 84 Ala. 48.) The four letters relied on do not constitute an acknowledgment under section 1387, as they were not attested by a witness. (*Pina* v. *Peck,* 31 Cal. 359; *Beach* v. *Botsford,* 1 Doug. (Mich.) 199; 40 Am. Dec. 45; *Kenyon* v. *Segar,* 14 R. I. 490; Webster's Dict., tit. Witness; Abbott's Law Dict., tit. Witness.) The letters relied on are insufficient, as they were not executed for the purpose of instituting the illegitimate child as heir. (*Estate of Sandford,* 4 Cal. 12; *Pina* v. *Peck,* 31 Cal. 359.) They are also insufficient because of not showing on their face that the child sought to be instituted as heir was illegitimate. (*Pina* v. *Peck,* 31 Cal. 359.) The case of *Pina* v. *Peck,* 31 Cal. 359, is absolutely controlling, as the legislature, by re-enacting the statute which it construed, made that construction a part of the statute itself, and to give it another construction now is virtually to repeal a legislative enactment. (Cooley's Constitutional Limitations, 6th ed., 66; Civ. Code, sec. 5; *Sharon* v.

*Sharon,* 67 Cal. 185–189; *Emery* v. *Reed,* 65 Cal. 351; *Hyatt* v. *Allen,* 54 Cal. 353; *Lindley* v. *Davis,* 7 Mont. 206; *Ex parte Reis,* 64 Cal. 241; *Douglass* v. *County of Pike,* 101 U. S. 677, 687; *Corker* v. *Corker,* 87 Cal. 643; Sutherland on Statutory Construction, secs. 307, 319; Endlich on Statutory Construction, sec. 367; *Estate of Garraud,* 35 Cal. 339.) The requirements of the statute must be fulfilled, even though hardship results. (*Ex parte Clark,* 87 Cal. 641; *Tyler* v. *Reynolds,* 53 Iowa, 146; *Shearer* v. *Weaver,* 56 Iowa, 578.)

*Timothy J. Lyons, Amicus Curiæ,* for William and David Savage.

Respondent's claim rests wholly upon an enactment of statutory law, and without which she has no standing. (Holland's Elements of Jurisprudence, 4th ed., c. 18, p. 336; *Jefferys* v. *Boosey,* 4 H. L. Cas. 815, per Jervis, L. C. J., 946.) As the whole case rests upon an enactment of positive law, the question to be resolved depends upon the sovereign power of such enactment. (Maine's Early History of Institutions, 347–354, 357, 365, 371–400; 4 Phillimore on International Law, 3d Eng. ed., p. 22,'xxvi.; Guthrie's Savigny's Private International Law, pp. 57–60, sec. 346; Westlake's Private International Law, London ed. of 1858, p. 132, art. 150; Sutherland on Statutory Construction, sec. 12.) Sovereign power is purely and simply territorial, — that is, it is bounded and limited by its territorial lines. (Guthrie's Savigny's Private International Law, pp. 57–60, sec. 346; Maine's Ancient Law, c. 4, pp. 97–108, also p. xxx., Dwight's Introduction; Maine's Early History of Institutions, 73, 74; Dig. 2, 1, 20; Endlich on Interpretation of Statutes, sec. 169; Story on Conflict of Laws, secs. 7, 20; *Pennoyer* v. *Neff,* 95 U. S. 714, 720, 722, 730; *Renaud* v. *Abbott,* 116 U. S. 277; Piggott on Foreign Judgments, pt. 1, p. 81; *Kilburn* v. *Woodworth,* 3 Wils. 297; *Pana* v. *Bowler,* 107 U. S. 529, 545; *Picquet* v. *Swan,* 5 Mason, 35, 40; *Farnum* v. *Blackstone Canal Corp.,* 1 Sum. 46, 62, 63; *Lopez* v. *Burslem,* 4 Moore P. C. C. 300, 305; Sutherland on Statutes, sec. 12;

Sedgwick on Statutes, 2d ed., 57, 58; 4 Phillimore on International Law, 2, 22; Cooley's Constitutional Limitations, 6th ed., 4, 149; Rorer on Interstate Law, 167; Endlich on Statutes, sec. 186, pp. 243, 244; Foote on Private International Jurisprudence, Introduction, xxiii.- xxix.; Guthrie's Savigny's Private International Law, secs. 345, 346, pp. 53-60, 63, 64, sec. 350, p. 86, sec. 356, p. 114, sec. 359, pp. 125, 126, sec. 361, p. 147; Westlake on Private International Law, art. 150, p. 134.) An enactment of positive law should be interpreted and construed by the courts of the *lex fori* so as not to apply the law to persons not within the territorial limits at the time when the law is claimed to have operated or have been imposed in the particular case. (*In re Louis*, 2 Dod. 239; *Regina* v. *Keyn*, L. R. 2 Ex. Div. 210; *Thomson* v. *Advocate-General*, 12 Clark & F. 1, 28; *Estate of Apple*, 66 Cal. 432; *Farnum* v. *Blackstone*, 1 Sum. 46, 62, 63; *Picquet* v. *Swan*, 5 Mason, 35, 40; *Jefferys* v. *Boosey*, 4 H. L. Cas. 815, 946; *Niboyet* v. *Niboyet*, L. R. 4 P. D. 1, 7, 19, 20; *The Zollverein*, Swab. 96, 98; *The Appollon*, 9 Wheat. 362, 370; *Cope* v. *Doherty*, 4 Kay & J. 367, 375; 2 De Gex & J. 614, 624; Endlich on Statutory Construction, sec. 169; Sutherland on Statutes, secs. 9, 12; Potter's Dwarris on Statutes, sec. 65; Bishop on Written Laws, sec. 11; Sedgwick on Statutes, 2d ed., 57, 58.) The jurisdiction and sovereignty of a foreign independent state were at all times complete over the respondent, and this involves the exclusion of all other states. California's assumption of jurisdiction would thus be mere usurpation. (Maine's Early History of Institutions, 353; *Pennoyer* v. *Neff*, 95 U. S. 714, 720; *The Appollon*, 9 Wheat. 362; *Niboyet* v. *Niboyet*, L. R. 4 P. D. 1, 7; *Picquet* v. *Swan*, 5 Mason, 35, 40; *Regina* v. *Keyn*, L. R. 2 Ex. Div. 210; Wharton's Commentaries on American Law, secs. 256, 290, 291; Wharton on Conflict of Laws, secs. 126, 248 et seq.; 4 Phillimore on International Law, 3d ed., 22-23, arts. 26, 27, p. 2; Foote's Private International Jurisprudence, Introduction, xxiii., xxix.; Guthrie's Savigny's Private International Law, secs. 345, 346, 350, 356, 359, 361; *Ross*

v. *Ross,* 129 Mass. 243; 37 Am. Rep. 321; *Estate of Apple,* 66 Cal. 434–437.) The construction given to the statute in *Pina* v. *Peck,* 31 Cal. 359, should be followed, as the existing statute is merely a continuation of the former one. (Civ. Code, sec. 5; *Eck* v. *Hoffman,* 55 Cal. 501, 502; *Estate of Apple,* 66 Cal. 432, 434; *Viterbo* v. *Friedlander,* 120 U. S. 707, 725, 726.)

*H. L. Gear, Amicus Curiæ,* for " London Savages."

The primary object of section 230 of the Civil Code is to affect the personal *status* of the child, so as to make him legitimate for all purposes, as therein declared. The purposes include all of the incidents pertaining to the personal relation of parent and child. (Civ. Code, secs. 196, 197, 206, 207, 213.) The heading of section 230 of the Civil Code, the title of chapter II., in which it is embodied, the title of title II., the title of part III., and the title of division I. of the code indicate the design of the legislature primarily and directly to affect the personal *status* of an illegitimate minor. These titles are properly to be considered in ascertaining the intent of the legislature. (*Barnes* v. *Jones,* 51 Cal. 306; *People* v. *Molineux,* 53 Barb. 15; 40 N. Y. 113, 119; *Williams* v. *People,* 45 Barb. 201; *Ex parte Koser,* 60 Cal. 205, 206; *Sharon* v. *Sharon,* 75 Cal. 16.) Section 230 of the Civil Code, relating primarily and directly to personal *status,* must be presumed not to have been intended to have any extraterritorial operation, as it could not properly have such operation under the *jus gentium.* The laws affecting all personal relations are presumed to have a limited territorial operation, not extending beyond the territory and subjects within the jurisdiction of the law-making power. (*Dow* v. *Gould etc. S. Min. Co.,* 31 Cal. 651, 652; *Dye* v. *Dye,* 11 Cal. 167; *Kraemer* v. *Kraemer,* 52 Cal. 302, 305; *Shumway* v. *Leakey,* 67 Cal. 458, 460; *Pearson* v. *Pearson,* 51 Cal. 125; Story on Conflict of Laws, sec. 113; Bishop on Marriage and Divorce, sec. 125; 7 Lawson's Rights and Remedies, sec. 3725.) Both the adopting father and

the adopted child must be personally subject to the laws of the state providing for an adoption, in order to render it effective. (Wharton on Conflict of Laws, sec. 251.) It must be presumed that the legislature did not intend any extraterritorial operation of its laws upon the personal *status* of alien subjects, or to change the *jus gentium* in regard to personal *status*. (*The Appollon,* 9 Wheat. 370; *Van Voorhis* v. *Brintnall,* 86 N. Y. 37; 40 Am. Rep. 505; *Estate of Apple,* 66 Cal. 434.) The code is only intended to establish "the law of this state" upon the subject to which it relates. (Civ. Code, sec. 4.) The requirement of "reception into the family" was not fulfilled, as Blythe actually had a domestic household here, into which he could have received the child. But even if he had no previous family, he could have constituted one by the very act of receiving the child as his own into his paternal custody and care, to live together under common conditions. (*Rollings* v. *Evans,* 23 S. C. 327; *Cox* v. *Stafford,* 14 How. Pr. 519; *Moyer* v. *Drummond,* 32 S. C. 165; *Carmichael* v. *Northwestern Mut. Ben. Ass'n,* 51 Mich. 496; *Lane* v. *Phillips,* 69 Tex. 240; 5 Am. St. Rep. 41; *Ellis* v. *White,* 47 Cal. 73; Black's Law. Dict., tit. Family; *Wilson* v. *Cochran,* 31 Tex. 677; 98 Am. Dec. 553; *Poor* v. *Hudson Ins. Co.,* 2 Fed. Rep. 432; Anderson's Law Dict., tit. Family; *Kitchell* v. *Burgwin,* 21 Ill. 45; *Greenwood* v. *Maddox,* 27 Ark. 157; *Miller* v. *Finegan,* 26 Fla. 29.) Not one of the requirements of section 230 can be dispensed with, and no mere intention to comply with its conditions, without an actual substantial compliance therewith, can be effectual to complete the statutory right of adoption and legitimation. (*Ex parte Clark,* 87 Cal. 641; *Tyler* v. *Reynolds,* 53 Iowa, 146; *Shearer* v. *Weaver,* 56 Iowa, 578; *Long* v. *Hewitt,* 44 Iowa, 363; *Keegan* v. *Geraghty,* 101 Ill. 26; *Furgeson* v. *Jones,* 17 Or. 204; 11 Am. St. Rep. 808.) Although section 1387 of the Civil Code appears to have been primarily and directly intended as a statute of succession, it seems that its construction has been fixed by a decision holding that it is designed to affect

the *status* of an illegitimate child, and that the fact of illegitimacy, as well as of paternity, must be acknowledged in a formal writing before a witness, to change such *status.* (*Pina* v. *Peck,* 31 Cal. 362, 363.) This decision never having been overruled since the enactment of the Civil Code, it is immaterial whether it was originally right or wrong, as the re-enactment of the statute must be taken as a legislative adoption of the former construction, which must be considered as if incorporated in the express terms of the statute. (Civ. Code, sec. 5; *Hyatt* v. *Allen,* 54 Cal. 356; *In re Baker,* 55 Cal. 303, 304; *Eck* v. *Hoffman,* 55 Cal. 502; *Anthony* v. *State,* 29 Ala. 27; *Duramus* v. *Harrison,* 26 Ala. 326; *Bank* v. *Meagher,* 33 Ala. 622; *Snider* v. *Barks,* 84 Ala. 53; *La Selle* v. *Whitfield,* 12 La. Ann. 81; *Myrick* v. *Hasey,* 27 Me. 9; 46 Am. Dec. 583; *McKenzie* v. *State,* 11 Ark. 594; *State* v. *Swope,* 7 Ind. 91; *Collins* v. *Wilhoit,* 35 Mo. App. 585; *Hussey* v. *Moser,* 70 Tex. 42.) If a liberal construction were had, it should be in view of the evident object to require a properly witnessed acknowledgment of the paternity of an illegitimate child, in order to constitute it an heir. All of the objects of the statute are to be considered, and one of its objects evidently is to honor matrimony and discourage concubinage, and disinherison of an illegitimate child is the natural and proper result, unless the father is willing to avow his shame before a witness. (*Succession of Llula,* 41 La. Ann. 87.) The legislature evidently intended a formal acknowledgment of the paternity of the illegitimate child before an attesting witness. A reasonable construction of a statute takes in the manifest intent of the legislature as part of the statute, though not fully expressed. (*Riggs* v. *Palmer,* 115 N. Y. 506; 12 Am. St. Rep. 819; *Mayor* v. *Root,* 8 Md. 95; 63 Am. Dec. 692; *Riddick* v. *Walsh,* 15 Mo. 519; Civ. Code, secs. 3511, 3542.) The requirement of the execution of the instrument "in the presence of a competent witness" should be reasonably construed, as requiring that the witness should be an attesting or subscribing witness. (*Beach* v. *Botsford,* 1

Doug. (Mich.) 199; 40 Am. Dec. 45.)    Section 1387, by
its terms, makes the "illegitimate" child the heir of
the person who, "in writing, signed in the presence of a
competent witness, acknowledges himself to be the
father of such child."    All the words after the word
"writing" relate to the execution and contents of the
"writing."    "Such" has "illegitimate" for its ante-
cedent, and relates to the quality there expressed, which
must be stated in the writing as matter of the acknowl-
edgment required.    "Such," when it stands for a pre-
ceding adjective, imports "of that kind"; "of that
particular quality or character specified."    (Webster's
Dict., tit. Such.)    It follows, that by the literal import of
section 1387, the fact of illegitimacy must be stated in
the written acknowledgment.    There is no question
either of strict or liberal construction, as against the
ordinary literal import of the words of the statute,
which must prevail, where there is nothing in the stat-
ute to indicate a contrary meaning.    (*People* v. *Weller*,
11 Cal. 86, 87; *Tape* v. *Hurley*, 66 Cal. 474; *Pena* v.
*Vance*, 21 Cal. 149; *Tyler* v. *Reynolds*, 53 Iowa, 146; Civ.
Code, sec. 13.)

*George W. Towle, Jr., Amicus Curiæ*, for "The Blythe
Company."

*Henry E. Highton*, and *E. D. Wheeler, Amici Curiæ*,
for Alice Edith Blythe.

*S. W. & E. B. Holladay, Amici Curiæ*, for the "Scotch
Blythes."

*W. H. H. Hart*, for Respondent.

The fact that plaintiff was born in England, and there
remained until after her father's death, cannot defeat
her right to claim adoption and legitimation under sec-
tion 230 of the Civil Code, as the law of the place of
domicile of the father controls in determining what will
legitimate an illegitimate child.    (*Harvey* v. *Ball*, 32

Ind. 89; *Munro* v. *Munro*, 7 Clark & F. 842, 871, 872, 874, 881; 1 Rob. App. 492; *Birtwhistle* v. *Vardill*, 7 Clark & F. 895, 955; *In re Wright's Trust*, 2 Kay & J. 607; 2 Jur., N. S., 465; Dicey on Domicile, 5, 6, 97, 182–186, 192, 193, 197, 198; Bar on International Law, sec. 102; Westlake on Private International Law, 35; Schouler on Domestic Relations, sec. 231; *In re Grove — Vaucher* v. *Solicitor to Treasury*, L. R. 40 Ch. Div. 216, 232; *Shedden* v. *Patrick*, 1 Macq. 535.) The questions that arise in this case under sections 230 and 1387 of the Civil Code relate to succession to property merely, and it is immaterial where plaintiff resided at the time of her father's death, or where she was born, or where her mother was domiciled. (Story on Conflict of Laws, 7th ed., sec. 424, 425, 430, 463.) A non-resident alien can inherit in this state, the same as a resident. (*Estate of Billings*, 64 Cal. 427; *Lyons* v. *State*, 67 Cal. 380; *Carrasco* v. *State*, 67 Cal. 385; Civ. Code, sec. 671, 672, 1404.) The decisions in *Estate of Sandford*, 4 Cal. 12, and *Pina* v. *Peck*, 31 Cal. 359, are no longer law in this state, as the rule of construction there applied was changed by the code. (Civ. Code, sec. 4; Code Civ. Proc., sec. 4; *Estate of Wardell*, 57 Cal. 491; *In re Jessup*, 81 Cal. 421.) The acknowledgment of the plaintiff was a sufficient public acknowledgment. (*Blair* v. *Howell*, 68 Iowa, 619, 622; *In re Jessup*, 81 Cal. 433, 434.) The fact that Blythe was unmarried would not preclude him from adopting the plaintiff. (*In re Jessup*, 81 Cal. 424.) The public acknowledgment was alone sufficient, under section 230 of the Civil Code, without fulfilling the requirement of "otherwise treating it as if it were a legitimate child," as the word "and," which precedes the latter requirement, should be read as "or." (Sutherland on Statutory Construction, sec. 252; *McConky* v. *Superior Court*, 56 Cal. 83.)

*T. I. Bergin*, also for Respondent.

The legislature undoubtedly had power to enact section 230 of the Civil Code. (*Beall* v. *Beall*, 8 Ga. 210; *In re*

*Stevens,* 83 Cal. 331; 17 Am. St. Rep. 252.) The section is to be liberally construed.. (*In re Jessup,*·81 Cal. 410, 419; Civ. Code, sec. 4.) No qualification or condition having been expressed in the statute, the court cannot, by construction, ingraft any upon it. (*Woodbury* v. *Berry,* 18 Ohio St. 462; *City of Eureka* v. *Diaz,* 89 Cal. 469; *Hawbecker* v. *Hawbecker,* 43 Md. 516; *Kolbe* v. *People,* 85 Ill. 337; *Harvey* v. *Ball,* 32 Ind. 98.) The decision in *Pina* v. *Peck,* 31 Cal. 361, under the statute of 1850, is not binding, as it was decided under the rules of strict construction, as being in derogation of the common law. (See *Pina* v. *Peck,* 31 Cal. 361; *Estate of Sandford,* 4 Cal. 12.) But in a later case, under the rule laid down in section 4 of the code the provision of the statute as re-enacted in section 1387 of the Civil Code was liberally construed. (*Estate of Wardell,* 57 Cal. 491.) The legislature has made radical and complete changes in the law of this state, and has brushed away the considerations which operated upon the court in the decision of *Pina* v. *Peck,* 31 Cal. 361. The common law, as a rule of decision, is only adopted so far as not repugnant to or inconsistent with the laws of this state. The common-law rule in relation to illegitimate children is peculiar to England, and does not obtain elsewhere. It was mainly based upon principles of the feudal system and the sanction attached to tenures of land. (*Butler* v. *Elyton Land Co.,* 84 Ala. 384.) The feudal system, of course, never prevailed in California. (*Miles* v. *Caldwell,* 2 Wall. 43; *Caperton* v. *Schmidt,* 26 Cal. 479.) In the next place, lands may be disposed of by olographic will, of which there need be neither record or witness. (*In re Shillaber,* 74 Cal. 144; 5 Am. St. Rep: 433.) Lastly, the owner may, at pleasure, adopt his illegitimate children, and thus clothe them with capacity to inherit. (*Estate of Wardell,* 57 Cal. 491; *Abney* v. *De Loach,* 84 Ala. 393.) Of course, the owner of land may, by olographic will, dispose of his estate to his illegitimate child, as well as to any other person. (Schouler on Domestic Relations, sec. 281.) Thus may heirship and title to real estate rest upon private instru-

ments not witnessed, not recorded, and upon the conduct and oral declarations of the deceased parent of the illegitimate child. (*In re Jessup*, 81 Cal. 408.) The writing, under section 1387, need not be subscribed or attested by a witness, as the word "witness" does not mean a subscribing or attesting witness. (*Bliss* v. *Shuman*, 47 Me. 252; Code Civ. Proc., secs. 1878, 1935.) As the statute does not require an attesting witness, the court cannot make such requirement necessary. The intention of the legislature is to be collected, not by traveling out of the statute, but from looking to the whole of the statute itself. (*Regina* v. *Manning*, 2 Car. & K. 902; *Burton* v. *Burton*, 1 Keyes, 359; *City of Eureka* v. *Diaz*, 89 Cal. 467.) It was not necessary that the acknowledgment, under section 230, should have been expressed in words, but it was sufficient if it could fairly be inferred from the acts and conduct of Blythe. (*Bailey* v. *Boyd*, 59 Ind. 297; *Rainey* v. *Gordon*, 6 Humph. 355; *Auzerais* v. *Naglee*, 74 Cal. 69; *Tuggle* v. *Minor*, 76 Cal. 101; *Manchester* v. *Braedner*, 107 N. Y. 346; *Fiske* v. *Hibbard*, 45 N. Y. Sup. Ct. 333; *Baskin* v. *Baskin*, 36 N. Y. 419.) The contention that the statute in question can have no extraterritorial effect is not well taken, as foreign laws are frequently afforded recognition in our jurisdiction, and our own laws recognized in foreign jurisdictions. (*Hoyt* v. *Thompson*, 5 N. Y. 340; *Matter of Accounting of Waite*, 99 N. Y. 448; *Francis* v. *Ocean Ins. Co.*, 6 Cow. 425; *Crapo* v. *Kelly*, 16 Wall. 624–629; *State* v. *Main*, 16 Wis. 422; *Paul* v. *Virginia*, 8 Wall. 180; *Humphreys* v. *Hopkins*, 81 Cal. 554; 15 Am. St. Rep. 76; *Estate of Ortiz*, 86 Cal. 306; 21 Am. St. Rep. 44; *People* v. *Williams*, 24 Mich. 157; 9 Am. Rep. 119; *Queen* v. *Anderson*, L. R. 1 C. C. 161; *In re Ross*, 140 U. S. 453.) Every state will enforce its own laws and policy, and never permit the laws of any foreign state to work injustice to its own citizens or subjects. (*Brook* v. *Brook*, 9 H. L. Cas. 205; *Mette* v. *Mette*, 1 Swab. & T. 416; *Kinney* v. *Commonwealth*, 30 Gratt. 858; 32 Am. Rep. 690; *State* v. *Kennedy*, 76 N. C. 251; 22 Am. Rep. 683; *Williams* v.

*Oates,* 5 Ired. 535; *Greenhow* v. *James,* 80 Va. 636; 56 Am. Rep. 603.) While it is true that the laws of California have no coercive operation outside the limits of the state, it is none the less true that such laws may permissively operate and affect a party within foreign territories. (*State* v. *Main,* 16 Wis. 422; *Parsons* v. *Lyman,* 20 N. Y. 112; *In re Ortiz,* 86 Cal. 315; 21 Am. St. Rep. 44; *Wilkins* v. *Ellett,* 9 Wall. 742; see Civ. Code, secs. 1182, 1183; Code Civ. Proc., secs. 226, 2013–2015, 2024; *Polydore* v. *Prince,* 1 Ware, 415; *Sims* v. *Sims,* 75 N. Y. 470; *Lemmon* v. *People,* 20 N. Y. 602, 603, 609; *Milliken* v. *Pratt,* 125 Mass. 374; 28 Am. Rep. 241; *Gilbreath* v. *Bunce,* 65 Mo. 349; *Sell* v. *Miller,* 11 Ohio St. 331; *Simonin* v. *Mallac,* 2 Swab. & T. 83; *Sottomayer* v. *De Barros,* L. R. 5 P. D. 94, 100.) As the legislature did not attach residence as a condition of enjoyment of the right conferred by the statute, the court cannot impose it. (*Burton* v. *Burton,* 1 Keyes, 359; *Halsey* v. *Beer,* 52 Hun, 366; *Kane* v. *McCarthy,* 63 N. C. 299; *Headman* v. *Rose,* 63 Ga. 458.) The *status* of a resident and subject of a foreign country may be changed by acts performed in this country under an act of Congress or of the legislature, even without the consent or concurrence of the person whose *status* is thus changed, (*Burton* v. *Burton,* 1 Keyes, 359; *Halsey* v. *Beer,* 52 Hun. 366; *Kane* v. *McCarthy,* 63 N. C. 299; *Headman* v. *Rose,* 63 Ga. 458; *Goodrich* v. *Russell,* 42 N. Y. 184; *Regina* v. *Manning,* 2 Car. & K. 902.) Nor is it any answer to these authorities, to say that they were cases involving the relation of husband and wife, and therefore inapplicable, for the reason that the domicile of the husband is the domicile of the wife, as that rule is a mere fiction which is never allowed to obscure, much less defeat, justice. (*Irby* v. *Wilson,* 1 Dev. & B. Eq. 582; *Mellen* v. *Mellen,* 10 Abb. N. C. 331; *People* v. *Home Ins. Co.,* 29 Cal. 533; 2 Best on Evidence, sec. 311.) The distribution of and the right of succession to the estates of deceased persons are matters exclusively of state cognizance, and the state undoubtedly had the right to

authorize Blythe to say to whom his property should go, and to determine who should be his heir. (*Cope* v. *Cope*, 137 U. S. 684; *Butler* v. *Elyton Land Co.*, 84 Ala. 393.) While it is true that, in England, illegitimate children, though subsequently legitimated by intermarriage of their parents, cannot inherit real estate (*Birtwhistle* v. *Vardill*, 2 Clark & F. 895), yet so peculiarly local is the rule, that as to lands in Scotland it does not prevail. (*Countess of Dalhousie* v. *McDouall*, 7 Clark & F. 816; *Munro* v. *Munro*, 7 Clark & F. 842.) The legislature had undoubted power to determine the legal effect of the acts required to be done by Blythe in order to legitimate the plaintiff, and to prescribe the consequences they should have. (*Brook* v. *Brook*, 9 H. L. Cas. 205; *Sussex Peerage Case*, 11 Clark & F. 146–153; *Greenhow* v. *James*, 80 Va. 639; 56 Am. Rep. 603; *Van Voorhis* v. *Brintnall*, 86 N. Y. 29; 40 Am. Rep. 505.) The law of the father's domicile at the time of the birth of the illegitimate child determines whether the child becomes or may become legitimate in consequence of the subsequent marriage of the parents. (Dicey on Domicile, p. 369, rule 6, p. 181, rule 35; *Countess of Dalhousie* v. *McDouall*, 7 Clark & F. 817; *Munro* v. *Munro*, 7 Clark & F. 842; *Udny* v. *Udny*, L. R. 1 Sc. & Div. App. 441; *In re Don's Estate*, 4 Drew. 198; *In re Wright's Trust*, 2 Kay & J. 595; *Lauderdale Peerage Case*, L. R. 10 App. C. 740–742, 758.) Modern jurists have generally eliminated the *lex domicilii* of the mother from the solution of the question. (Jacob on Domicile, sec. 30, p. 41; Dicey on Domicile, 181, 369.) As, until quite recently, subsequent marriage was the only known mode of legitimation of illegitimate children, the principle authorizing the recognition of such legitimation equally applies to any other authorized mode of legitimation. In this state, not only is *legitimatio per subsequens matrimonium* recognized, but *legitimatio per acta patris* is also sanctioned. (Civ. Code, secs. 230, 1387.) The law of domicile itself, as well as the law recognizing legitimation by subsequent marriage, will not be permitted to override a pos-

itive statute of the extraterritorial sovereignty, where the question may arise, or the known policy of the laws of that country. (*Ross* v. *Ross*, 129 Mass. 246; 37 Am. Rep. 321; Jacob on Domicile, sec. 29, p. 39; *Keegan* v. *Geraghty*, 101 Ill. 32; *Humphreys* v. *Hopkins*, 81 Cal. 551–554; 15 Am. St. Rep. 26.) The support and education given by Blythe to the plaintiff cannot be said to have been insufficient to show a treatment of the plaintiff as his legitimate child. He had the right to support and educate the child in such manner as to him seemed best. (Cooley's Constitutional Limitations, 483, *385. *Bainbridge* v. *Pickering*, 2 W. Black. 1325; *In re Ryder*, 11 Paige, 187; *Conway's Ex'rs* v. *Alexander*, 7 Cranch, 481.) As Blythe had no family, it was not essential that he should take the plaintiff into his family. (*In re Jessup*, 81 Cal. 456.) The rights conferred by legitimation are for the benefit of the child, and the child is presumed to consent to what is for its benefit. (*De Levillain* v. *Evans*, 39 Cal. 122, 123.) Where the child elects to assent to and accept the benefit of the statute, it does not lie in the mouth of any one to question the constitutionality of such legislation. (*People* v. *Bartlett*, 67 Cal. 156; *Lent* v. *Tillson*, 72 Cal. 412.)

*W. W. Foote,* also for Respondent.

Respondent's alleged foreign domicile does not affect her claim under section 1387 of the Civil Code, as that section refers to succession, and not to *status.* This is clear from the titles of that section, part, and division of the Code. (Pol. Code, sec. 4480, 4481.) Non-resident aliens may take under the law of succession. (Civ. Code, secs. 671, 672, 1404.) The provisions conferring rights of inheritance upon aliens are constitutional and valid. (*State* v. *Smith*, 70 Cal. 153; *Carrasco* v. *State*, 67 Cal. 385; *Lyons* v. *State*, 67 Cal. 380.) Section 1387 applies to children domiciled without the state. (*Harvey* v. *Ball*, 32 Ind. 98, 100 et seq.) The rule requiring a strict construction of statutes in derogation of the common law has been abrogated. (Civ. Code, sec. 4; *Ex parte Gutierrez,*

45 Cal. 429; *People* v. *Mortimer*, 46 Cal. 117; *People* v. *Soto*, 49 Cal. 67; *North Bloomfield etc. Co.* v. *Keyser*, 58 Cal. 315; *Apple's Estate*, 66 Cal. 432, 434; *Carrasco* v. *State*, 67 Cal. 385, 386; *In re Jessup*, 81 Cal. 408, 419, 421.) Section 5 of the Civil Code does not apply, as the provision of the act of 1850, which was construed in *Pina* v. *Peck*, 31 Cal. 359, and from which section 1387 was taken, was not a provision of an existing statute. The section of the act of 1850 was repealed in 1870. (Stats. 1869–70, p. 530; *In re Jessup*, 81 Cal. 408, 420.) Besides, the rule that where a statute is re-enacted the construction given to it in the former law is presumed to be adopted applies only where it does not appear to have been the intention of the legislature that a different construction shall prevail. (*Allen* v. *Ramsey's Heirs*, 1 Met. (Ky.) 635; *Yates's Case*, 4 Johns. 359.) Here there was a manifest intention that the new section should not be construed as the old one, the legislature having expressly declared by section 4 that it was to be liberally construed. This legislative direction is conclusive upon the courts. (Sutherland on Statutory Construction, secs. 307, 342; Endlich on Interpretation of Statutes, secs. 339, 365, and cases cited; *Winslow* v. *Kimball*, 25 Me. 493.) Statutes respecting legitimation of illegitimate children are designed to honor matrimony and discourage concubinage, and are to be liberally, or at least fairly, construed, so as to advance their beneficent object. (*Brewer* v. *Hamor*, 83 Me. 251, 254, 256, 257; *Livermore* v. *Peru*, 55 Me. 469, 472; *Dayton* v. *Adkisson*, 45 N. J. Eq. 603, 609; 14 Am. St. Rep. 763; *Llula's Succession*, 41 La. Ann. 87; *Dupre* v. *Caruthers*, 6 La. Ann. 156; *Swanson* v. *Swanson*, 2 Swan, 446, 454.) Furthermore, it has been determined that both sections 1387 and 230 are to be liberally construed. (*Wardell's Estate*, 57 Cal. 491; *In re Jessup*, 81 Cal. 408, 419, 421.) Section 1387 does not require, upon its face, that the acknowledgment shall be formal, or intended or executed for that specific purpose, or that it shall show that the child is illegitimate, and the court cannot construe

into it anything which it does not contain. (*Eureka* v. *Diaz*, 89 Cal. 467; *In re Jessup*, 81 Cal. 408, 419, 423; *Harvey* v. *Ball*, 32 Ind. 98; *Abney* v. *De Loach*, 84 Ala. 393, 399; *Hawbecker* v. *Hawbecker*, 43 Md. 516; *McKamie* v. *Baskerville*, 86 Tenn. 459; Sutherland on Statutory Construction, sec. 427.) The mere fact of acknowledgment is sufficient to satisfy the demands of section 1387. (*Crane* v. *Crane*, 31 Iowa, 296, 300 et seq.; *Brock* v. *State*, 85 Ind. 397, 399; *Grant* v. *Mitchell*, 83 Me. 23, 27.) The contention that the acknowledgment must show the fact of illegitimacy, so as to dispense with extraneous evidence of it is untenable, as the extraneous evidence cannot be so dispensed with. (*Grant* v. *Mitchell*, 83 Me. 23, 27; see *Abney* v. *De Loach*, 84 Ala. 393, 397, 399, 400.) The witness to the acknowledgment was a competent witness. (Black's Law Dict., tit. Competent Witness; Code Civ. Proc., sec. 1879; 1 Wharton on Evidence, 3d ed., sec. 391–393.) The requirement that the writing is to be executed in the "presence of a competent witness" made it necessary only that the witness should know of its execution. (*Osborn* v. *Cook*, 11 Cush. 532; 59 Am. Dec. 155; *Tilden* v. *Tilden*, 13 Gray, 114; *Combs's Appeal*, 105 Pa. St. 155, 158; *Wyndham* v. *Chetwynd*, 1 Burr. 421; *British Museum* v. *White*, 3 Moore & P. 689; 6 Bing. 310.) Where a statute requires a will to be executed in the presence of witnesses, but does not expressly provide for attestation by such witnesses, they need not attest the execution of the instrument by subscribing the same as witnesses, the law merely requiring their presence. (Endlich on Interpretation of Statutes, sec. 20; *Combs's Appeal*, 105 Pa. St. 155, 159; *Mellert's Appeal*, 13 Week. Not. Cas. 222, 223.) Although section 230 is a law of personal *status*, yet it is controlling in determining the respondent's legitimacy, without regard to the law of the claimant's domicile, as it is the law controlling succession. (Story on Conflict of Laws, secs. 481, 481 a, 483, 584; Wharton on Conflict of Laws, secs. 243 a, 273 et seq., 296, 576; Foote on Private International Jurisprudence, 46, 47;

*Danelli* v. *Danelli's Adm'r*, 4 Bush, 51, 61; *Harvey* v. *Ball*, 32 Ind. 98; *Loring* v. *Thorndike*, 5 Allen, 257, 262, 263, 269, 270; *Lingen* v. *Lingen*, 45 Ala. 410, 412 et seq.; *Smith* v. *Derr's Adm'r*, 34 Pa. St. 126–128; 75 Am. Dec. 641; *Barnum* v. *Barnum*, 42 Md. 251, 307; *Stoltz* v. *Doering*, 112 Ill. 234, 239; *Birtwhistle* v. *Vardill*, 7 Clark & F. 895, 913 et seq., 936; *Shedden* v. *Patrick*, 1 Macq. 535; *In re Don's Estate*, 4 Drew. 194, 198; *Atkinson* v. *Anderson*, L. R. 21 Ch. Div. 100, 104; *Doglioni* v. *Crispin*, L. R. 1 H. L. 301; *Adams* v. *Adams*, 154 Mass. 290.) In the cases which hold that the *status* as to legitimacy conferred upon a person by the law of his domicile is to be recognized as adhering to him in another state or country as determining his right to take by succession in the latter, it is generally held to be so only where such recognition is not inconsistent with or contrary to the spirit and policy of the laws of the other state. (*Keegan* v. *Geraghty*, 101 Ill. 26, 34; *Ross* v. *Ross*, 129 Mass. 243; 37 Am. Rep. 321; *Miller* v. *Miller*, 91 N. Y. 315; 43 Am. Rep. 669; *Dayton* v. *Adkisson*, 45 N. J. Eq. 603, 607–610; 14 Am. St. Rep. 763; *Stack* v. *Stack*, 6 Demarest, 280.) Section 230 also applies to the plaintiff, notwithstanding her English birth and residence, because it was and is the law of her father's domicile at her birth, and at the time of legitimation. (Jacob on Domicile, sec. 30; Dicey on Domicile, secs. 13, 181–193; Wharton on Conflict of Laws, secs. 243, 248; 4 Phillimore on International Law, 3d ed., 413; Foote on Private International Jurisprudence, 40, 47; *Loring* v. *Thorndike*, 5 Allen, 257, 274; *Caballero's Succession* v. *Executor*, 24 La. Ann. 573; *Aikman* v. *Aikman*, 3 Macq. 854; *Dalhousie* v. *McDouall*, 7 Clark & F. 817; *Munro* v. *Munro*, 7 Clark & F. 842, 871 et seq.; *In re Don's Estate*, 4 Drew. 194, 198; *In re Wright's Trust*, 2 Kay & J. 595; *Goodman* v. *Goodman*, 3 Giff. 643, 649, 650; *Lloyd* v. *Lloyd*, 13 Beav. 401, note; *Udny* v. *Udny*, L. R. 1 Sc. & Div. App. 441, 447 et seq.; *Lauderdale Peerage Case*, L. R. 10 App. C. 692, 739, 754, 758, 762; *In re Grove*, L. R. 40 Ch. Div. 216, 224, 231, 232, 236, 238 et seq., 242 et seq.) The domicile of the

mother and child, the place of birth of the child, and
the place of the legitimating act, when not the same as
the father's domicile, are immaterial. (Dicey on Domi-
cile, 185; Jacobs on Domicile, sec. 30; Foote on Private
International Jurisprudence, 39; *Munro* v. *Munro*, 7
Clark & F. 842, 872–884; *In re Wright's Trust*, 2 Kay & J.
595, 610; *Udny* v. *Udny*, L. R. 1 Sc. & Div. App. 441,
448; *In re Grove*, L. R. 40 Ch. Div. 216, 224.) The true
doctrine is, that the domicile of an illegitimate child fol-
lows that of its putative father as respects such child's
"capacity for legitimation." (Foote on Private Inter-
national Jurisprudence, p. 9, note 47; 4 Phillimore on
International Law, 3d ed., 413; Dicey on Domicile, 5,
184; *Munro* v. *Munro*, 7 Clark & F. 842, 881; *In re
Wright's Trust*, 2 Kay & J. 595; and see *In re Grove*,
L. R. 40 Ch. Div. 216, 238.) Section 230 does not oper-
ate extraterritorially, either as a law of succession or as
a law of the father's domicile in applying to a child
without the state. (Story on Conflict of Laws, sec. 430,
431 et seq.; *State* v. *Smith*, 70 Cal. 153; *Carrasco* v. *State*,
67 Cal. 385; *Lumb* v. *Jenkins*, 100 Mass. 527.) One
state or country may rightfully confer upon citizens and
residents of another a general civil *status* which will be
valid and effectual in the former, and which, through
comity, will be respected everywhere. (*Burton* v. *Burton*,
1 Keyes, 359; *Halsey* v. *Beer*, 52 Hun, 366; *Headman* v.
*Rose*, 63 Ga. 458, 464 et seq.; *Kane* v. *McCarthy*, 63 N. C.
299.) Every state has indisputable power to remove the
stain of bastardy from all persons, so far as their prop-
erty rights and other rights and capacities to be enjoyed
in its jurisdiction are concerned, however "indelible"
that stain may be by the law of the domicile of such
persons. (See *Miller* v. *Miller*, 91 N. Y. 315, 319; 43
Am. Rep. 669; *McGunnigle* v. *McKee*, 77 Pa. St. 81, 84;
18 Am. Rep. 428.) Section 230 is not, by its terms, ex-
pressly or impliedly limited to children or fathers being
within the state, or domiciled therein, or to acts of adop-
tion performed therein, and the court cannot interpolate
any exception or limitation into it. (Sutherland on

Statutory Construction, sec. 427; *McKamie* v. *Basker-ville,* 86 Tenn. 459; *Harvey* v. *Ball,* 32 Ind. 98.) The public acknowledgment in this case was sufficient, under section 230. No particular mode of acknowledgment or formality was necessary, mere acts and conduct being sufficient without any words. (*Bailey* v. *Boyd,* 59 Ind. 292, 297 et seq. See also Taylor on Evidence, sec. 649; 13 Am. & Eng. Ency. of Law, 224; *Berkeley Peerage Case,* 4 Camp. 416; *Coutts* v. *Greenhow,* 2 Munf. 363, 369, 377; 5 Am. Dec. 472.) The child's presence at the time of the acknowledgment was not necessary, nor was it necessary that the witnesses to the acknowledgment should personally know the child acknowledged. This case is analogous to that of the execution and acknowledgment of a will in the presence of witnesses. (*Osborn* v. *Cook,* 11 Cush. 532; 59 Am. Dec. 155.) The mere fact that Blythe conferred his name upon the child, and that she has always borne that name, is of itself evidence of a complete public acknowledgment of her as his child. It published and still publishes the fact to all his and her world. (*Bailey* v. *Boyd,* 59 Ind. 298; see *Coutts* v. *Greenhow,* 2 Munf. 363, 369, 377; 5 Am. Dec. 472.) The fact that Blythe was unmarried did not prevent his adopting and legitimating the plaintiff, under section 230. (*In re Jessup,* 81 Cal. 408, 424.) The action of Blythe in giving the plaintiff his name, and always speaking of her as his "daughter" and his "child," his affectionate letters to her, his anxiety about her health, and other similar acts, show conclusively that he treated her as legitimate. (*Coutts* v. *Greenhow,* 2 Munf. 363, 369, 377; 5 Am. Dec. 472; *Gaines* v. *New Orleans,* 6 Wall. 642, 700 et seq.) And the fact that he was educating her and bringing her up as his daughter constituted a daily assertion of her legitimacy. (*Berkeley Peerage Case,* 4 Camp. 416; 1 Taylor on Evidence, 7th ed., sec. 649; 13 Am. & Eng. Ency. of Law, 224.)

*Garber, Boalt & Bishop,* also for Respondent.

Section 1387 of the Civil Code is to be liberally con-

strued. (Civ. Code, sec. 4.) Even under the rule of strict construction, that section cannot be narrowed so closely as to defeat the legislative intent which may be made obvious by its terms, and by the mischief to be remedied by its enactment. (*Abney* v. *De Loach*, 84 Ala. 393.) The letters introduced in evidence acknowledge the relationship of father and daughter, and therefore this case differs widely from cases where all that the writing shows is a simple and incidental recognition or acknowledgment of paternity. (See *Estate of Sandford*, 4 Cal. 12; *Pina* v. *Peck*, 31 Cal. 359.) As the case of *Pina* v. *Peck*, 31 Cal. 359, depends wholly upon the doctrine of strict construction of the acknowledgment, it is not binding as authority in a case arising under the code. (*In re Jessup*, 81 Cal. 410.) For similar reasons, the doctrine that when a statute already construed is enacted, it is sometimes treated as having been re-enacted as construed, cannot apply, the implication of an adoption of the strict construction being confronted with and destroyed by the rule that the code provisions, no matter whence derived, shall be liberally and beneficially construed. (Civ. Code, sec. 4.) The statute of 1850 which it is claimed section 1387 of the Civil Code re-enacted was copied from a statute of Maine (Me. Rev. Stats. 1840–41, c. 93, sec. 3); but even that was not its original source, as the principle it embodies antedates the common law (*Gaines* v. *Hennen*, 24 How. 602); and therefore the decision in *Pina* v. *Peck*, 31 Cal. 359, is not binding, as the court should go back to the original source of the law for its interpretation. (See *Coulam* v. *Doull*, 133 U. S. 216.) But section 1387 altered the phraseology of the statute of 1850 very materially, and therefore there is no ground left for imputation of legislative intent to re-enact or continue the original strict construction of the statute in its original form. (See *Brewer* v. *Hamor*, 83 Me. 252.) It is not required by the terms of the statute that the acknowledgment must, in terms, or in or of itself, show a desire and purpose on the part of the parent to avail himself of the statute otherwise than such

purpose is inferable from a compliance with its terms. (See *Bailey* v. *Boyd*, 59 Ind. 292.) The presumption legally arises, that the father who recognizes his child in the mode which is pointed out by the particular statute in force and applicable intends, by such recognition, to confer upon the child the right of inheritance. (*Hartinger* v. *Ferring*, 24 Fed. Rep. 17.) As section 1387 simply affects the devolution of the property of the intestate father, there is no more reason for giving it a strained or harsh construction than for giving such to the provisions concerning pretermitted heirs or olographic wills. (*In re Soher*, 78 Cal. 482; *Stones* v. *Keeling*, followed and reported in *Rice* v. *Efford*, 3 Hen. & M. 227, 228.) It was evidently the intention of the legislature to establish the most liberal and extensive rules of succession to estates in favor of all in whose favor the intestate himself, had he made a will, might have been supposed to be influenced. (*Stones* v. *Keeling*, followed and reported in *Rice* v. *Efford*, 3 Hen. & M. 227, 228.) The language of the statute being implicit, the court can put no words into it. (*Hawbecker* v. *Hawbecker*, 43 Md. 516; *Woodbury* v. *Berry*, 18 Ohio St. 456; *Lane* v. *Schomp*, 20 N. J. Eq. 85, 86.) It was not necessary that the writing should be formally made for the purpose of complying with the statute, nor that it should proclaim the bastardy; but the acknowledgment may be shown by any authentic act, though done for another purpose. (*Label* v. *Besson*, Jurisprudence Générale, Dalloz et Verge, Deuxieme Partie, 64; *Succession of Fletcher*, 11 La. Ann. 60; *Remy* v. *Second Municipality*, 11 La. Ann. 159; *Blasini* v. *Succession of Blasini*, 30 La. Ann., pt. 2, p. 1393.) It was not necessary that the writing should be attested by the witness, as the statute does not require an attesting witness, and no such requirement can be interpolated. (*Combs's Appeal*, 105 Pa. St. 159; *Camp* v. *Stark*, 32 P. F. Smith, 238, 239; *Hoysradt* v. *Kingman*, 22 N. Y. 372; *Coffin* v. *Coffin*, 23 N. Y. 9; 80 Am. Dec. 235; *Gamble* v. *Gamble*, 39 Barb. 373; *Parramore* v. *Taylor*, 11 Gratt. 220–254; *Will of Smith*, 52 Wis. 547; 38 Am. Rep.

756; Schouler on Wills, sec. 326; *Welch* v. *Adams*, 63 N. H. 344; 56 Am. Rep. 521.) The fact that the letters are olographic is important to be considered upon the question of compliance with the statute, as criticism of the terms and manner of the attempted compliance in such a case need not be so close and severe as in other cases. (*In re Beckett*, 103 N. Y. 174; see *Beckwith* v. *Talbot*, 95 U. S. 292.) There was a full compliance with section 230 in this case. (See *In re Jessup*, 81 Cal. 410, per Fox, J.) It was not necessary that the plaintiff should be in California, in order to be received into Blythe's family. To "receive" does not necessarily imply or call for a bodily, corporeal indwelling and abiding, but there may be, so to speak, a constructive presence and a constructive reception. (See Century Dict., tit. Receive; 1 Bishop on Marriage and Divorce, secs. 385 et seq.; 2 Parsons on Contracts, 77.) The acknowledgments that she was his child were attended with such publicity and with such solemnities as would leave no defect of proof. (*Blasini* v. *Succession of Blasini*, 30 La. Ann. pt. 2, p. 1397.) It was not intended by the statute to exact the concurrence of all the facts or acts specified. (*Mathean* v. *Mathean*, Jurisprudence Générale, Dalloz et Verge, Deuxieme Partie, p. 17.) The asserted niggardliness on the part of Blythe is not sufficient to overturn his unequivocal and frequent admissions, his course of conduct, his support of plaintiff, his constant recognition of her, and his many and strong expressions of attachment. (*Vincent's Appeal*, 60 Pa. St. 228.) The treatment, reception, and acknowledgment in this case, as showing reception into the family, was sufficiently shown. (See *White* v. *White*, 82 Cal. 446.) The fact that the plaintiff was born and resided in England would not deprive her of the benefits of section 230. (*Courbin* v. *Verriere*, Jurisprudence Générale, Dalloz et Verge, Deuxieme Partie, p. 193; *Loring* v. *Thorndike*, 5 Allen, 259; *In re Butler*, 58 Hun, 400; *Stack* v. *Stack*, 6 Demarest, 280; *Munro* v. *Munro*, 7 Clark & F. 842; *In re Grove*, L. R. 4 Ch. Div. 216, 232.)

*Works & Works,* also for Respondent.

GAROUTTE, J.—This is an action instituted under section 1664 of the Code of Civil Procedure by the plaintiff, a minor, through her guardian, to determine the heirship and title to the estate of Thomas H. Blythe, deceased. The section provides that in all estates now being administered, or that may hereafter be administered, any person claiming to be heir to the deceased, or entitled to distribution in whole or in part of such estate, may, at any time after the expiration of one year from the issuance of letters testamentary or of administration, file a petition in the matter of such estate, praying the court to ascertain and declare the rights of all persons to said estate and all interests therein, and to whom distribution thereof should be made. The case is most important, from any view. The defendants, claiming to be collateral kindred, are numbered by the hundred, many of them represented by separate counsel of great ability and experience in the law; the property interests involved are very large; the trial in the *nisi prius* court extended continuously through the greater portion of a year; the facts are novel, and the principles of law applicable many and complicated.

Plaintiff's claim is based upon sections 230 and 1387, respectively, of the Civil Code of California. Section 230 reads as follows:—

"Sec. 230. The father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate child, thereby adopts it as such; and such child is thereupon deemed for all purposes legitimate from the time of its birth. The foregoing provisions of this chapter do not apply to such an adoption."

Section 1387, as far as it pertains to the matters involved in this litigation, provides:—

"Sec. 1387. Every illegitimate child is an heir of the person who, in writing, signed in the presence of a com-

petent witness, acknowledges himself to be the father of such child."

As a result of the trial, the court filed findings of fact, and its conclusions of law based thereon are to the effect that the plaintiff, Florence Blythe, was and is the child of Thomas H. Blythe, deceased; that said Thomas H. Blythe legally adopted her under the provisions of section 230 of the Civil Code; that she is his lawful heir, and the only person entitled to have and receive distribution of the estate of said Thomas H. Blythe, deceased.

The principles of law and the facts of the case bearing upon her contention under these respective provisions of the code are entirely dissimilar, involving a separate discussion; and in the construction of section 230, our investigation also necessarily divides itself into two distinct branches.

1. Was plaintiff so domiciled with relation to her putative father's domicile as to have rendered any action of his looking to adoption available for that purpose? or, placing the interrogatory in the clear and emphatic language of appellants' counsel (to which interrogatory they all with great confidence give answer, Yes), Was she so domiciled or so situated that she could not be subject to the laws of California, and be by those laws transmuted from bastardy to legitimacy?

2. If her situation endowed her with the capacity for legitimation, did the acts of Blythe bring her within the requirements of the statute?

The facts found by the court which face us while we are engaged in a consideration of the first branch of this subject may be succinctly and substantially stated as follows: —

1. That plaintiff was born in England, upon December 18, 1873, and was the issue of Thomas H. Blythe and Julia Perry;

2. That Julia Perry was a native of England, domiciled therein, and continued to there reside until one month after the death of said Blythe;

3. That plaintiff remained in England until after the death of Blythe, when she came to California, and said Blythe was never at any time within any of the countries of Europe after the twenty-ninth day of August, 1873;

4. That said Blythe was a citizen of the United States, and of the state of California, domiciled in said state, and died intestate therein, April 4, 1883, leaving surviving him no wife, no father, no mother, and no child, save and except said Florence Blythe, the plaintiff herein;

5. That said Thomas H. Blythe and said Julia Perry never were married, and said plaintiff was begotten while said Blythe was temporarily sojourning in England, and was born after said Blythe's return to California, and that said Blythe never was married.

Before passing to the merits of the discussion, we pause a moment to say that the verb " adopts," as used in section 230, is used in the sense of "legitimates," and that the acts of the father of an illegitimate child, if filling the measure required by that statute, would result, strictly speaking, in the legitimation of such child, rather than in its adoption. Adoption, properly considered, refers to persons who are strangers in blood; legitimation, to persons where the blood relation exists. (See law dictionaries, — Bouvier's, Black's, Anderson's, and Rapalje's.) This is the distinguishing feature between adoption and legitimation, as recognized by all the standard law-writers of the day who have written upon the subject; and for the reason that the text-writers and the decisions of courts, to which we shall look for light and counsel, treat the subject as a question of legitimation, we shall view the matter from that stand-point.

The section is broad in its terms. It contains no limitations or conditions, and to the extent of the power vested in the legislature of the state, applies to all illegitimates, wherever located and wherever born. The legislature has not seen fit to make any exception to its operation, and as was said by Taney, C. J., in *Brewer* v. *Blougher*, 14 Pet. 178, when considering a quite similar provision of a statute: " In the case before us, the words

are general, and include all persons who come within the description of illegitimate children, . . . . and when the legislature speaks in general terms of children of that description without making any exceptions, we are bound to suppose they design to include the whole class."

Bar, in his work on International Law (p. 434), says: "Legitimation of bastards, either by subsequent marriage or by an act of the government (*Rescriptum principis*), is nothing but a legal equalization of certain children illegitimately begotten with legitimate children." In other words, the object and effect of section 230 is to change the *status* and capacity of an illegitimate child to the *status* and capacity of a child born in lawful wedlock.

This case, upon its facts, presumably stands alone in legal jurisprudence, for counsel, in the exercise of great learning and unexampled industry, have failed to parallel it. We have here a father at all times domiciled in the state of California, a mother at all times domiciled in England, and an illegitimate child born in England, and continuously there residing until the death of her father in California. As to the effect of our statutes upon such a state of facts, the consideration of the matter of domicile of these parties, and the principles of law applicable thereto, is a most important element to its proper determination, and it is a source of some satisfaction to be able to say that there are elementary principles pertaining to this subject of domicile, even though few in number, upon which practically all the text-writers stand on common ground, to wit: —

1. The domicile of the mother is the domicile of the illegitimate child, and the place of birth of the child is an immaterial element.

2. In a case of *legitimatio per subsequens matrimonium,* the place of marriage does not affect the question.

3. Legitimation by a subsequent marriage depends upon the law of the domicile of the father; Dicey on Domicile, 181, and other text-writers, supported by many authorities, holding that the domicile of the father at the

date of the birth is the vital inquiry, and other author-
ity (Fraser on Parent and Child, 52; Bar on Interna-
tional Law, 434; Savigny on Private International Law,
302) holding that the domicile of the father at the date
of marriage is the determinative fact.

Inasmuch as the deceased, Blythe, was domiciled in
California both at the time of the birth of the child and
at the time he performed the acts which it is claimed re-
sulted in legitimation, this question does not become an
issue in the case, and we are not called upon to dispel
the clouds of doubt that envelop it.

The contention of appellants that the *status* of a per-
son residing in a foreign country and a subject thereof
cannot be changed by acts performed in California, un-
der a provision of the law of our state legislature, cannot
be supported as a rule without many exceptions, and to
the extent of those exceptions, a state law must be held,
by its own courts at least, to have extraterritorial opera-
tion. And this principle of the foreign operation of
state laws even goes to the extent that in many instances
such laws are recognized and given effect by the courts
of that particular foreign jurisdiction. The doctrine of
extraterritorial operation of state laws is fully exempli-
fied in the case of *Hoyt* v. *Thompson*, 5 N. Y. 340, where
the court says: " It is a conceded principle, that the laws
of a state have no force, *proprio vigore*, beyond its terri-
torial limits, but the laws of one state are frequently per-
mitted by the courtesy of another to operate in the latter
for the promotion of justice, where neither that state nor
its citizens will suffer any inconvenience from the appli-
cation of the foreign law. This courtesy, or comity, is
established, not only from motives of respect for the
laws and institutions of the foreign countries, but from
considerations of mutual utility and advantage."

The case of *Burton* v. *Burton*, 1 Keyes, 359, is a strik-
ing illustration of the operation of a law of the United
States in affixing a different *status* to a foreign subject
resident in a foreign country. In that case, after plain-
tiff's marriage to Burton in a foreign land, he himself

being a foreign resident and subject at the time, he emigrated to the state of New York, was naturalized, and there died. Although an actual resident of England at all times, upon the death of her husband she came to New York, and claimed her right of dower, upon the ground that she was a citizen of the United States, made so by virtue of the naturalization of her husband under a general act of Congress to that effect, and her claim was upheld. In conclusion, the court uses this language: "It is said, furthermore, that she did not, by residence, or in any other way, assume the allegiance of the United States, or give her assent to the citizenship conferred by the act. This, however, was not necessary, to entitle her to claim its benefits." In *Headman* v. *Rose*, 63 Ga. 458, the same question was again presented, and that court said: "When the claim was first presented here as to whether Mrs. Rose could claim to be a citizen of the United States under the provisions of that act of Congress (having never been in the United States until after the death of her husband), we were all inclined to the opinion that she could not, but upon a more careful examination of that statute, in the light of the interpretation which has been given to it by the supreme court of North Carolina in *Kane* v. *McCarthy*, 63 N. C. 299, and by the court of appeals of New York in *Burton* v. *Burton*, 1 Keyes, 371, and in *Kelley* v. *Owen*, 7 Wall. 496, in which the supreme court of the United States cites the case of *Burton* v. *Burton*, 1 Keyes, 359, approvingly, we hold and decide that if Mary Rose was married to William Rose, the intestate, and he was a naturalized citizen of the United States, then she, by the terms and provisions of the act of Congress of 1855, was also a citizen of the United States." It will be noticed that these decisions are not based upon the principle that the domicile of the husband was the domicile of the wife, and that consequently she was deemed to be in this country at the date of his naturalization, and therefore came under the operation of the act, but they rest upon the broad principle that Congress has not only the power to say what aliens shall be-

come citizens of the United States, but what acts shall create such citizenship. The fact that these cases bear upon the political *status* of the party, rather than upon his civil *status*, does not weaken their force as authority here. In principle, no distinction can be discerned in this regard. In both cases there is involved an exercise of the same sovereign power. This doctrine has been carried to still greater lengths in criminal cases, where a crime has been committed in a foreign jurisdiction. In the Warrender case, 2 Clark & F. 539, Lord Brougham remarked: " But it may be said that the offense being committed abroad, and not within the Scotch territory, prevents the application to it of the Scotch criminal law. To this it may, however, be answered, that where a person has his domicile in a given country, the laws of that country to which he owes allegiance may visit even criminal offenses committed by him out of its territory. Of that we have many instances in our own jurisprudence; murder and treason committed by Englishmen abroad are triable in England, and punishable here. Nay, by the bill which I introduced in 1811, and which is constantly acted upon, British subjects are liable to be convicted of felony for slave-trading, in whatever part of the world committed by them."

Section 215 of the Civil Code is as follows: —

" Sec. 215. A child born before wedlock becomes legitimate by the subsequent marriage of its parents."

This section takes a wide range; its operation is not confined within state lines; it is as general as language can make it; oceans furnish no obstruction to the effect of its wise and beneficent provisions; it is mamma to the bastards of the world. If Blythe, subsequent to the birth of plaintiff, had returned to England and married Julia Perry, such marriage, under the provision of law just quoted, *ipso facto*, would have resulted in the legitimation of Florence Blythe. Then, in answer to the interrogatory of appellants already noticed, we say that she was so domiciled that by the laws of California she could have been changed from bastardy to legitimacy.

Our statute, conjoined with principles of international
law, would have changed her bastardy to legitimacy in
the world at large; and regardless of international law,
and regardless of all law of foreign countries, our statute
law alone would have made her legitimate in the world
at large, whenever and however that question should
present itself in the courts of California.   And we also
have here a most striking illustration of the extraterri-
torial operation of California law.   We have the effect
of a statute of this state attaching to a state of facts
where the mother and child were never in California,
but residing and domiciled in England, and the mar-
riage taking place in England; and California law, as
stated, has the effect upon that child to give it a different
domicile, and completely change its *status*.   Such would
not only be the effect of this law upon the child viewed
by California courts, but such would be its effect viewed
by the courts of England, where the child was domiciled,
and that, too, notwithstanding no provisions of law are
there found for the legitimation of bastards.   This as-
sumption of Blythe's marriage to Julia Perry, in its facts,
forms an exact photograph of the celebrated case of
*Munro* v. *Munro*, found in 1 Rob. App. 492,— a case crys-
tallizing the judicial thought of the age upon the subject,
and commanding the respect of all writers and judges
upon the law of domicile.   We shall make copious ref-
erences and indulge in liberal quotations from that de-
cision, for its legal soundness never has been questioned,
and as we view the subject, it casts a flood of light upon
many matters involved in the investigation at hand.   ·

Munro, a Scotch gentleman of fortune domiciled in
Scotland, while upon a visit to London, cohabited with
an Englishwoman domiciled in England, and a child
was the result of such cohabitation.   He subsequently
married the woman in England, and it was held, under
the law of Scotland, by the House of Lords sitting as a
court of appeal (although if it had been a case appealed
from the English courts, the decision would, undoubt-
edly, have been the same), that such child was thereby

legitimated, Scottish law providing for legitimation *per subsequens matrimonium.* It was there said: " It is maintained that the pursuer having been born in England of an Englishwoman not married at the time of the birth, she was born an illegitimate child; that that *status* of illegitimacy was indelible by the law of England; and that a subsequent marriage, even taking it to be a Scotch marriage, could not legitimate the child, or wipe off the indelible stain of illegitimacy. We cannot assent to this proposition, and with all possible deference to any different opinions, we know of no authority for it in the law of Scotland, or among the jurists and writers on general law, in the application here attempted to be made of it. . . . . To say, again, that because the child was born in England of an English mother, her illegitimacy is indelible, if this means that it is indelible by the law of England, and under the law of England, is to say no more than that the law of England has not adopted the rule of legitimation *per subsequens matrimonium;* but if it be meant that because a child was born in England it cannot become legitimate in Scotland by a Scotch marriage, is a question to be determined by the law of Scotland, it is a *petitio principii* for which there is no authority whatever in that law. . . . . We are here in a Scotch question and in a Scotch court, applying a plain rule of our law, and unless that law says that if a child be born in England it shall not have the benefit of the rule, we do not see how it is at all material that it could not enjoy it if the law of England were to be applied to the case; but we know of no exception in the law of Scotland, nor, as far as we are informed, is there any such exception recognized in the law of any country which holds the principle of legitimation *per subsequens matrimonium.* We are not here giving any opinion on a point about which it does not belong to us to form any judgment. We are not inquiring what the law of England might decide if the pursuer, or any person similarly situated, were making a claim in an English court of law in respect of property within their jurisdiction.

. . . . We are aware that conflicts of law may take place, and there is no help for it when they do occur; but the question before us is a purely Scotch question, to be ruled by general principles, no doubt, but still with reference to the law of Scotland in that particular point, and we cannot, in consistency with the established principles of that law, hold that this pursuer could not become legitimated by the marriage of her parents, when or wheresoever she may have been born. It appears to us to be very clear that the circumstance of the mother being *English* adds nothing at all to the supposed difficulty in the place of the pursuer's birth. She was certainly illegitimate by the law of England, and by the law of Scotland also, at the time of her birth, and she would have been so equally though her mother had been a Scotchwoman. Lord Mackenzie said: ' I cannot help entertaining doubt whether the indelibility of English bastardy has any meaning beyond this, that an English bastard is not legitimated by an English marriage. . . . . But suppose it were true that English bastardy is indelible, not only against a marriage in England, but against a marriage all the world over, — I say, suppose there was produced a statute providing and declaring that an English bastard born in England should remain a bastard all the world over, notwithstanding anything that could be done in any country, — I ask, could we give it effect? Could we acknowledge the authority of such a statute? I think we will be bound to say that the English Parliament might rule the fate of the bastards in England, but that its laws were not entitled to extend to other countries, and that there was no principle of the law of nations which would give effect to such a statute.' " In summing up his conclusions, the Lord Chancellor, after holding Munro to be domiciled in Scotland, said: " If that be a correct conclusion from the evidence, it follows that the appellant in *Munro* v. *Munro*, being the child of a domiciled Scotchman, had at the moment of her birth a capacity of being legitimatized by the subsequent marriage of her

parents for all civil purposes in Scotland, and that she, accordingly, by their subsequent marriage in 1801, be-came legitimated, and, as such, capable of succeeding to the property in question."

The foregoing views of learned judges are in direct conflict with the arguments of appellants' counsel in this case; and such views were declared to be the law, after able arguments there made upon the same lines as here presented. Appellants insist that the domicile of the child irrevocably fixes that child's *status.* In this case, subsequent to the child's birth, Julia Perry mar-ried a domiciled Englishman; hence her domicile was permanently established in England, and for that rea-son, the child's domicile, being the mother's domicile, was permanently established there. Under appellants' reasoning, this state of facts would forever debar the child from legitimation, for even its presence in California would avail nothing as against its English domicile. If such be good law, section 226 of the Civil Code, ex-pressly authorizing the adoption of minors of other states, is bad law, for it is squarely in conflict with those views.

We find in Story's work upon Conflict of Laws (sec. 105 a) the following: "6. As to issue born before the marriage, if by the law of the country where they are born they would be legitimated by the subsequent mar-riage of their parents, they will by such subsequent mar-riage (perhaps in any country, but at all events in the same country) become legitimate, so that this character of legitimacy will be recognized in every other country. If illegitimate there, the same character will belong to them in every other country." But Judge Story's cita-tions in its support do not clearly bear him out, and legal authority to the effect that the place of birth forms no element in the case vastly preponderates.

We have in *Loring* v. *Thorndike*, 5 Allen, 257, a case involving additional elements, and therefore additional complications, even to those found in the Munro case. The man was domiciled in Massachusetts. The woman

was domiciled in Mayence. The illegitimate children were born in Frankfort-on-the-Main, and the marriage occurred at that city. To accomplish legitimation, the Massachusetts law required not only a subsequent marriage, but a subsequent acknowledgment of the child. Upon this state of facts, and this provision of law, the child was held legitimate by the Massachusetts court, even though the acts of acknowledgment occurred in a foreign country. In the case of *In re Grove*, L. R. 40 Ch. Div. 216, Lord Chief Justice Cotton said: "What is really necessary, I think, is, that the father should at the time of the birth of the child be domiciled in the country allowing legitimation, so as to give to the child the capacity of being made legitimate by a subsequent marriage; but it is the subsequent marriage which gives the legitimacy to the child, who has at its birth, in consequence of its father's domicile, the capacity of being made legitimate by a subsequent marriage." In the same case, Lord Justice Fry stated: "The appellant claims through Sarah Thomegay, who was born in 1744, in this country [England], and was an illegitimate child of Marc Thomegay and Martha Powis. At birth that child took the domicile of its mother, and it took the *status* of illegitimacy according to the law of the domicile of its mother, and it took also the capacity to change that *status* of illegitimacy for one of legitimacy, provided that, according to the law of the domicile of the father, the subsequent marriage would work legitimation. The position of such a child, therefore, is curious, taking domicile and *status* from the mother, but taking the potentiality of changing its *status* from its putative father." In the case of *Shedden* v. *Patrick*, 1 Macq. 535, the father being domiciled in the state of New York at the date of the child's birth, and there being no law of legitimation in New York, the child was declared illegitimate by the English courts.

Appellants' counsel confidently insist that *Ross* v. *Ross*, 129 Mass. 243, 37 Am. Rep. 321, is valuable as an authority to support their views. After a careful exam-

ination of the opinion in that case, we are unable to per-
ceive its force as authority here.  A child was legally
adopted in Pennsylvania.  The adoptive parent removed
with the child to Massachusetts, where the father became
domiciled, and there died, leaving real estate in that com-
monwealth.  The litigation arose upon a question as
to who was entitled to inherit, and the court said: "We
are therefore of the opinion that the legal *status* of the
child of intestate, once acquired by the demandant under
a statute and by a judicial decree of the state of Penn-
sylvania, while the parties were domiciled there, con-
tinued after their removal into this commonwealth, and
that by virtue thereof the demandant is entitled to main-
tain this action."  Respondent's position in this case
controverts no principle of law there declared, and it is
difficult to see how the court could have arrived at a
different conclusion.  The judgment would have been
the same if the father had never changed his domicile
to Massachusetts, and probably the same if there had
been no law of adoption whatever in that state.  *Miller*
v. *Miller*, 91 N. Y. 315, 43 Am. Rep. 669, in principle,
seems to have been that character of case, and the same
conclusions were there arrived at by the court.  In the
celebrated case of *Birtwhistle* v. *Vardill*, 2 Clark & F. 840,
to which the learned chief justice refers in his opinion
in the Ross case, the decision would have undoubtedly
been in line with *Ross* v. *Ross*, 129 Mass. 243, 37 Am.
Rep. 321, if, in lieu of the Statute of Merton, England's
law of descent had been similar to the Massachusetts
provision.  The case of *Foster* v. *Waterman*, 124 Mass.
592, involves nothing but a single question of statutory
construction, and in no manner supports the proposition
that a resident of one state cannot adopt a child under
the adoption laws of another state, where such child is
domiciled, but *Appeal of Wolf*, 13 Atl. Rep. 760, does hold
directly to the contrary of such contention.

The doctrine of indelibility of bastardy in England is
not correct in its broadest sense, for it is in the power of
Parliament to legitimate bastards at any time.  Neither

is the rule universal that a child legitimate in one country is legitimate in all the world. /This principle of different *status* in different countries finds a striking illustration in Lolly's case, reviewed and dissented from by Lord Brougham in *Warrender* v. *Warrender*, 2 Clark & F. 539. In that case the facts disclose that Lolly was married in England, divorced in Scotland, and upon his return to England and making a second marriage, he was then tried and convicted of bigamy. Here we have a state of facts where, under the respective laws of England and Scotland, Lolly, after his divorce and prior to his second marriage, was a married man in England and an unmarried man in Scotland, and after his second marriage he had a lawful wife in Scotland and a different lawful wife in England, thus having two lawful wives at the same time. It can hardly be said that Lolly's *status* was the same in both countries. A similar principle is applied to the legitimacy of children by subsequent marriage. The provisions of section 215 would operate upon and legitimate a child born of a father who, at the time of its conception and birth, was the husband of another woman, or would apply to an incestuous bastard. Such was expressly declared to be the law under a similar provision of a state statute in the case of *Hawbecker* v. *Hawbecker*, 43 Md. 516, the court saying: " No doubt, the legislature, in thus mitigating the severe rule of the common law, intended to hold out to the sinning parents an inducement to marry, and thus put a stop to the mischiefs of further illicit intercourse between them, *but, in our opinion, the main purpose and intent of the enactment we are now considering was to remove the taint and disabilities of bastardy from the unoffending children whenever their parents did marry, without regard to the deepness of guilt on the part of their parents in which they were conceived and born.*" Such a child, under the canon law, would be deemed an adulterine or incestuous bastard, incapable of legitimation, and in the courts of certain countries where that law controls would not be recognized as legitimate. Thus is presented a case, and

by no means an anomalous one, where the child would be legitimate in California, and illegitimate by the laws of various other countries. (See Fraser on Parent and Child, 56, subd. 10.)

We have quoted thus extensively from the authorities upon the subject of domicile as specially bearing upon the question of *legitimatii per subsequens matrimonium*, for the reason that we are unable to perceive any difference in the general principles of law bearing upon that character of legitimation and in those principles bearing upon other forms of legitimation authorized by the same statute. The only distinction claimed by appellants is, that legitimation founded upon subsequent marriage is based upon the fiction of law that a previous consent existed, and the marriage related back to that time. Upon this point it would seem all-sufficient to say that our statute does not recognize such a fiction, and its effective operation in no wise depends upon the assumption of its presence. Times are not what they once were, and we live in an age too practical to build our law upon the unstable foundation of fictions. In *Birtwhistle* v. *Vardill*, 2 Clark & F. 840, Tyndall, L. C. J., in speaking upon this question, says: "Pothier, on the other hand, when he speaks of the effect of a subsequent marriage in legitimating children born before it, disclaims the authority of the canon law, nor does he mention any fiction of an antecedent marriage, but rests the effect upon the positive law of the country. He first instances the custom of Troyes, and then adds . . . . that it is a common right, received throughout the whole kingdom." Schouler on Domestic Relations (sec. 226) says: "The principle to which the law of legislation *per subsquens matrimonium* is to be referred has been a subject of controversy. The canonists base the law, not on general views of expediency and justice, but upon a fiction which they adopted in order to reconcile the new law with established rules; for, assuming that, as a general rule, children are not legitimate unless born in lawful wedlock, they declared that by a fiction of law parents

were married when the child was born. Such reasoning, by no means uncommon when the wise saw more clearly what was right than why it was so, has not stood the test of modern logic, and the Scotch courts have placed the rule once more where its imperial founders left it, namely, on the ground of general policy and justice."

Upon principle, no distinction can be made between the rules of law applicable to these various forms of legitimation. Many of the states of this Union, in order to effect those ends, require, in addition to a subsequent marriage, that the father (in some states both father and mother) shall also acknowledge the child. This is the case of *Loring* v. *Thorndike*, 5 Allen, 257, where the marriage not only took place in foreign territory, but as is said in *Ross* v. *Ross*, 129 Mass. 259, the facts of the acknowledgment occurred in a foreign jurisdiction. Thus Massachusetts law required marriage *and* acknowledgment, and invoked the rule of domicile of the father to establish the capacity of the child for legitimation. Section 2405 of the Revised Code of Alabama allows legitimation of a bastard child simply by acknowledgment of the father in writing, certified and recorded. No consent of the mother is required; no notice to or consent of the child is demanded. If such a statute were found within the lids of the Civil Code of this state, under the facts of this case as they appear upon the question of domicile, Blythe, by following the requirements of the provision of law there laid down, could legitimate his illegitimate child. California law (Civ. Code, sec. 215) declares that marriage *ipso facto* results in legitimation, and section 230 declares that acknowledgment accompanied by certain other acts shall result in legitimation. If the principle of the domicile of the father is good law where marriage and acknowledgment are both required to accomplish the result, that principle is no less good law when applied to marriage alone under section 215, or when applied to acknowledgment alone under the Alabama Code, or

when applied to acknowledgment accompanied by other acts under section 230 of the Civil Code of this state.

Dicey says (p. 192): "Question. What is the effect, according to English law, of a person being made legitimate by the authority of a foreign sovereign? Suppose that a person born illegitimate is legitimated by a decree of the Czar of Russia; will such a person be held legitimate here? There is no English authority on the subject. The most probable answer is (it is conceived), that the effect of such a decree would, like the effect of a subsequent marriage of the parents, depend on the domicile of such person's father at the time of the birth. *Suppose, that is to say, that D, the child's father, were domiciled in Russia at the time of the child's birth, the decree would have the effect of making the child legitimate in England.* A person, on the other hand, born of a father domiciled in England could not be made legitimate here by the force of any foreign law."

Bar, in his International Law, has discussed this identical question at length, although it can scarcely be said to be even incidentally mentioned in the works of either Savigny, Foote, Phillimore, or Schaffner. He says (sec. 198): "In what we have said we have proceeded on the footing that legitimation, if the consent of the child be validly given, is dependent solely on the personal law of the father, and that, therefore, if this law allows legitimation by an act of the head of the state, it matters not to inquire whether some other legal system, in particular the personal law which the child has hitherto enjoyed, recognizes this legitimation; but that, on the contrary, legitimation *per rescriptum* is to be regarded in international law on exactly the same footing as legitimation *per subsequens matrimonium.* This opinion, which, as we think, is the prevailing opinion in German jurisprudence, and in which, too, Fiore (sec. 149), Phillimore (sec. 542), and Wharton (sec. 249) concur, has, however, often been disputed. In the first place, it has been said that an act of that kind by a sovereign must necessarily have its operation confined to the dominions

of that sovereign, for he has no authority beyond these limits; but if it be true, generally, that the personal law of the father is the rule, that law must be allowed to say that legitimation can take place by means of an act of that kind. The legitimation is to be recognized, not because the sovereign is to exercise sovereign rights in another country, but because the personal law is to have effect there. The opposite opinion, which is held by older writers, is no doubt explained, and to some extent justified, by the imperfect legal capacity which in the middle ages, and in many territories down to later times, clung to the bastard, especially, too, as the sole result of legitimation, even in the territory of the sovereign who bestowed it, was in many cases merely to withdraw the estate of the person so legitimated, upon his death, from the grasp of his sovereign, etc. . . . . . But, in the second place, the more modern French school, while they reject the view of the older writers as to the effect of the legitimation being necessarily confined to the territory of the sovereign who bestows it, refuse to recognize this kind of legitimation, unless it is also recognized in the personal law which the child has hitherto enjoyed. In this way, one who has hitherto been a French child, in respect that the Civil Code has never sanctioned legitimation _per rescriptum_, can never be legitimated by the act of a foreign sovereign. But Laurent, in arguing in support of this doctrine that legitimation touches the _status_ of persons, and that this _status_ must be determined everywhere of Frenchmen by the law of France, proves too much. This rule would have to hold, also, in the cases of legitimation by subsequent marriage, so that in this case, also, the personal law of the child would be the only rule."

In this connection, and as bearing directly and emphatically upon the general principles involved in the solution of the important question presented by this branch of the case, we again quote from Bar (sec. 194): " If the personal law of the child requires more conditions to be observed before it will pronounce that a child

has been legitimated, the reason of that is, not any anxiety for the interest of the child, so much as for that of the father and his family, e. g., the other children, his collateral relations; but the state, to which the child has up to that moment belonged, has no interest in that matter, and if that legal system which is charged with the protection of the family is willing to hold the child legitimated, there is in truth no conflict between the two systems. That system to which the child has hitherto belonged says: 'If the father belonged to me, I would not hold the child to be legitimated.' That involved no contradiction of the other system, which says: 'Since the father belongs to me, I do hold the child to be legitimated.' No doubt we must assume that assent of the child is given in due legal form, for legitimation can only take place against the child's wish if the personal law of the child forces that upon him or her; but in by far the greater number of cases it will be beyond all doubt that the legitimation is advantageous to the child, and the child or its guardian can subsequently signify its approval of and found upon it."

Legitimation is the creature of legislation. Its existence is solely dependent upon the law and policy of each particular sovereignty. The law and policy of this state authorize and encourage it, and there is no principle upon which California law and policy, when invoked in California courts, shall be made to surrender to the antagonistic law and policy of Great Britain. It was said in *Munro* v. *Munro*, 1 Rob. App. 492: "We are here in a Scotch question and in a Scotch court, applying a plain rule of our law, and unless that law says that if a child be born in England it shall not have the benefit of the rule, we do not see how that it is at all material that it could not enjoy it if the law of England were to be applied to the case "; and again: "We are not inquiring what the law of England might decide if the person were making a claim in an English court of law in respect of property within their jurisdiction." And we say here, plaintiff was the child of Blythe, who was a

domiciled citizen of the state of California. She founds her claim upon the statutes of this state, and is now here invoking the jurisdiction of the courts of this state. It is a question of California law to be construed in California courts, and we see nothing in our constitution or statutory law, or in international law, to have prevented Blythe from making the plaintiff his daughter in every sense that the word implies. In conclusion, we hold that Blythe being domiciled in the state of California both at the time of the birth of plaintiff and at the time he performed the acts which it is claimed resulted in the legitimation of plaintiff, and California law authorizing the legitimation of bastards by the doing of certain acts, it follows that Florence Blythe, the plaintiff, at all times was possessed of a capacity for legitimation, under section 230 of the Civil Code of this state.

We pass to an examination of the second branch of the discussion involved in the consideration of section 230; namely, if plaintiff's situation endowed her with the capacity for legitimation, did the acts of Blythe bring her within the requirements of the statute? Those requirements are: 1. He shall publicly acknowledge the child as his own; 2. He shall receive it as his child, with the consent of his wife, if he is married, into his family; 3. He shall otherwise treat it as if it were a legitimate child.

As to these matters, the trial court found in detail the facts to be, that Blythe had fulfilled every requirement of the statute. These findings are strenuously attacked as being unsupported by the evidence, and we are called upon to pass upon its sufficiency in this regard.

This section of the code is entitled to a liberal construction, because section 4 provides: "The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this code. The code establishes the law of this state respecting the subjects to which it relates, and its provisions . . . . are to be liberally construed, with a view to effect its objects and to promote justice." By virtue of this provision, the

court, in the case of *In re Jessup*, 81 Cal. 419, has expressly declared that this section shall have a liberal construction, but, as there said, "liberal construction does not mean enlargement or restriction of a plain provision of a written law. If a provision of the code is plain and unambiguous, it is the duty of the court to enforce it as it is written. If it is ambiguous or doubtful, or susceptible of different constructions or interpretations, then such liberality of construction is to be indulged in as, within the fair interpretation of its language, will effect its apparent object and promote justice."

Did Blythe acknowledge the plaintiff to be his own child? The word "acknowledge" has no technical meaning, and in its ordinary acceptation is defined, by Webster, "to own or admit the knowledge of." It is not necessary to dwell at great length upon this special element necessary to satisfy the statute. Under the evidence, it can hardly be considered debatable. Blythe declared the plaintiff to be his child, to all persons, upon all occasions. He was garrulous upon the subject. Aside from his business occupations, his mind ever rested upon his relations to the child, and it was his common topic of conversation. If necessary to this decision, it could almost be held that he shouted it from the house-tops. He acknowledged the child to its mother and to its grandmother before it was born, and subsequently, in no single instance, was he ever heard to deny its paternity. It was named and baptized Florence Blythe at his request, and ever after has been known to the world as Florence Blythe. Authority is not necessary to be cited to support this branch of the case, but *In re Jessup*, 81 Cal. 419, is not only in accord with this position, but conclusive in its favor. This acknowledgment was also public, for, as we have seen, the thought of concealment of the paternity of the child never entered his mind. Why should it, when it is entirely apparent from the evidence that he was proud of such paternity?

2. Did Blythe receive it as his child, with the consent
XCVI. CAL.—37

of his wife, into his family?  Blythe had no wife, and
that element of the statute is eliminated from the case.
No construction of the statute, however rigid, would hold
the existence of a wife necessary, before the benefits to
be derived under this section could possibly attach to an
illegitimate child.  This question of the wife's consent
can only be a material element when there is a wife to
consent.  *In re Jessup*, 81 Cal. 419, fully recognizes and
necessarily adopts this principle, for in that case, as here,
the father of the child had no wife to consent, and such
fact would thus have defeated plaintiff's claims at the
very threshold of the litigation.  It may be conceded,
for the purposes of this case, that if Blythe had a family,
such child must have been received therein, or the stat-
ute would not have been satisfied; but, as we have seen,
if Blythe had no wife to consent, that requirement has
no standing here; so if he had no family into which the
child could have been received, that element is foreign
to the case.  Under the rule of liberal construction laid
down in the case of *In re Jessup*, 81 Cal. 419, such must
necessarily be the law.  To give that meaning to the
statute by which all men who have no families are de-
barred from legitimating their illegitimate offspring
would be to give the section a harsh and illiberal con-
struction.  Unless the provision is so plain and explicit
as to amount to an express inhibition to that effect, upon
every principle of right and justice we could not so hold.
The rule of construction as declared in the Jessup case
is, that if the statute is ambiguous or doubtful, or sus-
ceptible of different constructions or interpretations,
then such construction is to be indulged as, within the
fair interpretation of its language, will effect its apparent
object and purpose.  Section 1866 of the Code of Civil
Procedure further provides: " When a statute or instru-
ment is equally susceptible of two interpretations, one
in favor of natural right, and the other against it, the
former is to be adopted."  Applying these tests of statu-
tory construction to this provision, but one result can
flow therefrom, and that is, the existence of a family, no

more than the existence of a wife, is an indispensable element to a complete and perfect adoption (or legitima. tion, more properly speaking) under this provision of law.    This view is fully borne out by the decision in *In re Jessup*, 81 Cal. 419.    It is said in the decision of the court in that case, referring to Jessup: " As he had no home and no family in the strict sense of a ' collective body of persons who live in one house and under one head or manager, a household including parents, children, and servants,' it would not be a fair or liberal construction to say that the child had not been adopted or acknowledged because he had not been received in such a home or made a member of such family."    It is needless to say that the Jessup case was considered with the care that its importance demanded, for the record discloses that fact; and it may be suggested that upon this question alone the court stood together.    Indeed, the learned counsel representing appellants in that case throughout their arguments conceded such to be the law.    Blythe had no family.    The court found that he was living with a mistress in San Francisco from the year 1880 to the time of his death.    He appears to have lived in lodging-houses during all these years.    He had no relations, save of the collateral line, and they were at all times residing in a foreign country.    He had not seen them or communicated with them for more than ten years prior to his death, and at no time had he seen any of them, or communicated with any of them, since Florence Blythe, the plaintiff, was born.    If he had a family, either this mistress or these collateral kindred constituted that family.    Such cannot be the fact, and it would be a travesty upon the word to so hold.    It was held in the Jessup case that the father had a family, in the sense of brothers and sisters, with whom he was brought into frequent contact, and from whom he concealed and denied the paternity of the child, and for these reasons, and others, the court held there was no adoption.    There are no facts in this case in the slightest degree comparable to those there presented.    In that

case, the language of the court as to this point bears directly upon the question of acknowledgment, and not as to the reception into the family; and we have already seen that a public acknowledgment was made by Blythe against which nothing can be said. If the term "receiving it into his family" does not necessarily mean an actual reception into an actual family, but may mean a constructive reception into a constructive family, then such measure of requirement is filled to the brim. Plaintiff was baptized in Blythe's name at his request. Their correspondence indicates hearts filled with mutual affection. Her picture looked down upon him from its place upon the wall. At his rooms her name was a household word.

We pass to the examination of the remaining element of the statute, to wit: "He shall otherwise treat it as a legitimate child." If the father has publicly acknowledged the child to be his child, and has taken it into his family, it would seem but little remained to be done to wash away forever the stain of bastardy. The public acknowledgment of the child is the main fact. It is the important factor, in the eyes of the statute. If the child was publicly acknowledged and received into the family, it would be a novel case where a court of equity would close its doors and refuse to declare a legitimation because the child was poorly clothed and illy fed. That case has not yet arisen, and it is hoped and believed it never will. The statute clearly means that the father must treat his illegitimate child as he would naturally treat his legitimate child, not as the majority of men in his financial circumstances would or should treat their children. Every man furnishes the rule by which he must be measured. No imaginary standard of excellence can be created, and then it be demanded that Blythe shall rise to that standard. If appellants' contention be true, a child whose father was an ignorant man believing education an evil to be shunned, and who therefore denied an education to the child, could not be granted legitimation. Upon appel-

lants' theory, an illegitimate child whose father was a miser would be compelled to bear forever the stain of bastardy. While Blythe was a man of large property interests, his estates were heavily involved. Money was required in many channels, and it is not probable that he had any surplus of cash on hand. Plaintiff was well clothed and well fed. It appears that at no time was she deprived of the necessaries of life. She resided at all times either with her mother or her grandfather. Blythe furnished something near $150 a year for her support; certainly during her infancy this was entirely sufficient, and no complaints were made to him that more money was needed to meet her wants. At all these times he himself was either stopping in a log house in the mountains of Trinity, or living with his mistress in lodgings in San Francisco, surrounded by his dogs, birds, and cats, while his hens were located upon the roof. It may well be inferred from the simplicity of his own life as indicated by the foregoing circumstances, that if legitimate children had been born to him, they would have been treated, as far as pecuniary expenditures were concerned, upon the same lines as this illegitimate child was treated. He made a will, which was subsequently lost or destroyed, wherein he provided for her. He corresponded with her as a father would correspond with his little daughter. He had her christened in the name of Florence Blythe. Her health, her education, and her religion were matters in which he exercised the utmost concern. She occupied his thoughts, and her name was upon his lips in his dying hour. For these reasons, it may well be said that "he otherwise treated her as a legitimate child."

We pass to an examination of section 1387 of the Civil Code, upon which plaintiff relies to constitute herself an heir of Thomas H. Blythe, deceased. That section declares, *inter alia*, that "every illegitimate child is an heir of the person who, in writing, signed in the presence of a competent witness, acknowledges

himself to be the father of such child." It is unnecessary to decide whether this provision affects the *status* of a child, or whether it is alone a statute of descent. If it either directly or indirectly touches upon *status*, our views upon the question, as. herein previously expressed, are applicable. If it is a statute of descent, pure and simple, — and *Estate of Magee*, 63 Cal. 414, seems to so declare in explicit terms, — then the plaintiff is entitled to all the benefits of it, regardless of domicile, *status*, or extraterritorial operation of state laws.

The rules of liberal construction applicable to section 230 are likewise to be invoked in the consideration of section 1387; and the obvious purpose and intent of the legislature in making this enactment was to entitle illegitimate children to inherit their father's estate, the same as legitimate children. Did the intestate, Blythe, in writing, signed in the presence of a competent witness, acknowledge that he was the father of the claimant, Florence Blythe? Upon an inspection of the provision, we see that the word " acknowledge " must be viewed in the light of its ordinary acceptation, and it is therefore used in exactly the same sense as when found in section 230. The acts required to constitute the acknowledgment are not laid down in the statute. No stated form of acknowledgment is there found by which we may be guided. Again, we must take this statute as we find it. We are not here to construct a statute, but to construe a statute. We can neither interpolate nor eliminate, and we are bound to assume that the legislature enacted the law as it now stands with a due comprehension of the meaning of words and of the rules of statutory construction, and that they incorporated into the act all that was intended, and that they intended that effect should be given to all that was found therein.

The writings relied upon in this case to bring plaintiff within the provisions of the statute are various letters, written at different times, by Blythe to his daughter and her grandfather, which letters were. signed by him in the presence of W. H. Hart, who was a competent

witness. These letters, as to the question of acknowledgment of relationship, are of the same general charter and import, and our investigation will be limited to the consideration of two of them, one a letter to the grandfather and the other a letter to the daughter, either of which, to our minds, fully satisfies the statute. He writes a letter to the plaintiff, from which we quote: —

"*My Darling Child*, — You have made your father very happy by writing to him your little letter. . . . . But I feel sad to learn that my own dear child has been sick, and her papa not being near to help her. You say you wonder when you shall see your dear papa. Well, my dear child, it is about like this: Your papa . . . . After that your papa will leave San Francisco, . . . . and have his dear Florence with him always. . . . . I should like my dear daughter to write to her papa a letter once every month. . . . . Grant is now laying at my feet, while his master is writing his first letter to his own darling child, far away. . . . . May God bless you, my dear child. From your loving father,

"THOMAS H. BLYTHE."

The letter to the grandfather was read to said Hart, and signed in his presence. We quote: "I look at the proposed baptism of dear Flora as a matter of very deep importance. After full deliberation, I think it best to have Flora brought up in the Episcopal Church, — Church of England. You will, therefore, please have my daughter christened at once, and have her named after her father, Florence Blythe."

There can be but one construction placed upon these letters, and that is, they mean that Florence was the daughter of Thomas H. Blythe, — "his own dear child." These letters acknowledge the relationship of father and daughter, not hesitatingly and grudgingly, but willingly, gladly, and entirely. When a father says, "You are my own darling child," "I am your father; you shall be baptized in my name, and loved, cherished, and protected always," the subject is exhausted, the cup of acknowledg-

ment is filled to overflowing. If letters are entitled to be used as writings to prove the fact of acknowledgment, these letters prove that fact. It was decided in *Bailey* v. *Boyd*, 59 Ind. 297, under a statute requiring the father to acknowledge his illegitimate child subsequent to marriage, before such child should be held legitimate, that "it was not necessary that this acknowledgment should have been expressed in words, but it may fairly be inferred from the acts and conduct of the elder Bazil." But it is now insisted that the writing must be a writing specially prepared for the sole object of making the illegitimate child an heir of the father. The adjudications of courts are not favorable to this view. In the case of *Rice* v. *Efford*, 3 Hen. & M. 227, it was held that the recognition of the illegitimate child in a will as the testator's child, the will being void as a will, was sufficient to entitle him to inherit. Chief Justice Tucker, in this connection, saying in *Stones* v. *Keeling*, reported in the same volume, upon the following page: "The act of 1785, it should be remembered, relates to the disposition of property only, and proceeds to show who shall be admitted to share the property of a person dying intestate, notwithstanding any former legal bar to a succession thereto, and in that light the law ought to receive the most liberal construction, it being evidently the design of the legislature to establish the most liberal and extensive rules of succession to estates in favor of all in whose favor the intestate himself, had he made a will, might have been supposed to be influenced, and here there can be no doubt, had he died testate, that these daughters would have been the first object of his care." Reading the present case in the light of the evidence furnished by the record, there can be no doubt but if Blythe had died testate, Florence would have been the first object of his care. In *Succession of Fletcher*, 11 La. Ann. 60, Henry Fletcher, in an act of manumission made before a notary and witnesses, described the party enfranchised by his act as his "natural daughter, slave," and such was held to be a sufficient acknowledgment of paternity, under a statute which de-

clared that " the acknowledgment of an illegitimate child
shall be made by a declaration executed before a notary
public, in the presence of two witnesses." In that case
the court, citing French authorities, held: " It is said
that the words ' natural daughter, slave,' were terms of
description foreign to the purpose of the act, used to
manumit a slave, and not to acknowledge her paternity,
but no form is prescribed for such an acknowledgment,
save only that the declaration be made before a notary
public, in presence of two witnesses. If the declaration
be thus made, it seems to be immaterial whether it be
the main object of the act, or not." In *Remy* v. *Munici-
pality*, 11 La. Ann. 159, the court, in referring to the ac-
knowledgment of paternity made in a will, said: " This
document, it is true, was intended to be a will, and has
never been admitted to probate as such, but though not
binding as a will, it is certainly good as an acknowledg-
ment of paternity, made in due form." Section 1387 is
essentially a statute of inheritance, and there is no more
fitting place for the father to recognize the moral duty
enjoined upon him toward his illegitimate offspring than
by acknowledging that child in his last will and testa-
ment in accordance with the provisions of that section;
and the fact that the acknowledgment was subsidiary
to the main object and purpose of the testator in mak-
ing the document would not thereby weaken the effect
of the writing as an acknowledgment.

Under the statute of Indiana, marriage and subse-
quent acknowledgment of the paternity of the child by
the father constituted a legitimation of the child, and in
the case of *Brock* v. *State*, 85 Ind. 397, where the father
married the woman and acknowledged the child for the
sole purpose of escaping a prosecution for bastardy, and
with the intention at the time of the marriage to imme-
diately abandon the mother and child, it was held that
such intentions were entirely immaterial, and that his
acts created a legitimation.

In *Crane* v. *Crane*, 31 Iowa, 296, the question here
involved squarely presented itself. The statute of Iowa

provided for legitimation by a recognition in writing of the illegitimate child by the father. Two propositions upon which appellants insist are directly decided against them in that case. It was held that a formal writing of recognition was not necessary, but that letters to a friend would suffice, and it was further held that the references to the child in the letters were sufficient to constitute recognition. The references by the father in those letters to the child as his child, while quite clear, are weak, vague, and unconvincing when compared to the references upon the same subject found in the letters of Blythe. A majority of the states of this Union, and also various countries of Europe, require the illegitimate child to be recognized or acknowledged by the father before legitimation takes place, yet no authority has been cited from any state or country (and we therefore confidently assume there is none), except the case of *Pina* v. *Peck*, 31 Cal. 359, to which our attention shall be presently directed, which holds that a formal recognition or formal acknowledgment is necessary, in order to constitute a legitimation.

It is insisted that the witness Hart should have subscribed his name to the writing as a witness thereto, but "competent witness" and "subscribing" or "attesting" witness are in no sense synonymous terms. In *In the Matter of Noble*, 124 Ill. 270, the court says: "'Credible witnesses,' as used in the statute relating to wills, has been construed, both in England and this country, to mean *competent witnesses;* that is, such persons as are not legally disqualified from testifying in courts of justice by reason of mental incapacity, interest, or the commission of crime, or other cause excluding them from testifying generally, or rendering them incompetent in respect of the particular subject-matter or in the particular suit." As before remarked, it is not the duty of the court to add to or subtract from the words of the statute. We must construe it as it stands enacted. If the legislature had intended such witness to be a "subscribing" or "attesting" witness, it was easy for it to have said so.

Not having so declared, it would be judicial legislation for this court to so hold the statute to be. Section 1940 of the Code of Civil Procedure provides that a writing may be proved by any one who saw it executed, and we cannot say but that such proof was contemplated by the legislature when it framed this provision of the statute. Our codes contain many instances where the term " attesting witness " or " subscribing witness " is used, when the signature of the witness is required to give life to a written instrument, and we must presume that the legislature did not intend that the writing should be signed, when it did not so declare. In all the statutes of the various states, wherever the signature of a witness to any document is required, we find the statute either using the words " attesting witness " or " subscribing witness." Under the liberal rules of construction by which this court must be guided, and under the principle laid down by Chief Justice Tucker in *Stones* v. *Keeling*, 3 Hen. & M. 228, we are not called upon to defeat this plaintiff's claims by holding that the words " competent witness," as used in the statute, should be construed to mean " attesting " or " subscribing " witness. The law of Pennsylvania requires that the will of a married woman shall be executed in the presence of two witnesses, and the court said, in *Combs's Appeal*, 105 Pa. St. 159: " Such witnesses were not required to subscribe their names thereto." If more need be said on this behalf, we would suggest that this statute was originally copied from a statute of the state of Maine, which also used the words "competent witness "; but subsequently the legislature of that state amended the statute by causing it to read, " *and attested by a* competent witness," that legislature thus recognizing not only the fact that legislation was necessary in order that the witness should be required to sign the writing, but also that it was a matter with which the legislature should deal and with which the courts had no concern. It is a familiar principle of statutory construction that a statute taken and enacted from the laws of another state carries with it the construction given to

it by the laws of that state. The amendment made to the statute of Maine clearly indicates what construction was there given this provision of section 1387.

In speaking as to the construction of statutes relating to the form and manner of making wills, the court said in *In the Matter of Simpson*, 56 How. Pr. 126: "The restrictions which from motives of prudence are thrown around the right should be construed liberally in favor of the testament, and forms should not be required which the legislature has not plainly prescribed." The question as to the wisdom and policy of this provision is not a matter for our consideration. This court is not the forum to administer relief for evil in this law, if evil there be. If the law is not what it should be, let the legislature follow the course adopted by the state from which it took the law, and amend the statute in this regard, as that state has done. As the law is now written, compliance has been had with it, and having determined that matter, the investigation is concluded, as far as this court is concerned.

It is further insisted that the letters, when placed in the crucible by which they are to be tested, are found wanting, because it is said that the writing must be complete in itself; that is, it must show upon its face that the child is an illegitimate child, and that it was signed in the presence of a competent witness. We find nothing in the law subjecting the writing to any such test. The statute does not require it. Such recitals would not add one jot to the weight and credit to be given to the writing by the court, if they were there found stated. They would have no more weight and be of no more avail in arriving at a final determination of the merits of the cause, than if Blythe had said in the writing, "I made this writing, and the facts therein stated are true." A statement in the writing that it was signed in the presence of a competent witness could not be evidence of that fact; no more would a reference in the writing to the child as an illegitimate child establish such illegitimacy. In *Grant* v. *Mitchell*, 83 Me. 26, the court, in

speaking to this question, said: "In either case, it must first appear that the child is illegitimate. The statute does not, nor does it purport to, act upon any other; nor does the subsequent marriage, adoption, or acknowledgment have any tendency to prove this fact. Whatever may be the effect of the acknowledgment in showing the paternity of one proved to be illegitimate, it cannot be taken as proof of the illegitimacy." Blythe, in writing, acknowledged himself to be the father of Florence Blythe; Florence Blythe is an illegitimate child; therefore, Blythe acknowledged himself to be the father of an illegitimate child. This logic is unassailable, and no sound reason can be adduced why the acknowledgment should contain a declaration of bastardy.

Bearing upon both branches of this case, as to the policy of the law, and the true principle of construction to be invoked, we quote the apt language of Beatty, C. J., in the Jessup case (81 Cal. 435), and the views there expressed in no wise conflict with the principles declared in the main opinion of the court. He says: "The only argument that can be made against his claim to inherit his father's estate rests upon a strict construction of the statutes, remedial in their nature, designed to secure to innocent unfortunates in his situation a just share of the rights to which they are by nature as fully entitled as are legitimate offspring. No doubt a strong argument can be built on this basis of strict construction against the decision of the superior court. But I adhere to the view so strongly put and so satisfactorily maintained by Justice Works in his opinion, that in cases of this kind the only strictness required is in proof of paternity. That being satisfactorily established by plenary proof, I think courts should lean strongly in favor of a finding that the father of an illegitimate child has done what every honest and humane man should be not only willing but eager to do, and what a just law would compel the unwilling to do. I also think it a wholly unauthorized construction of the statute to hold that the acts of recognition, acknowledgment, etc., necessary to legitimize a natural child should

be performed with the express intention on the part of the father of accomplishing that object. If the acts are in themselves such as the statute prescribes, I think they confer legitimacy without any reference to the intent with which they are performed./ There is no danger to morality in recognizing the natural rights of illegitimate children as against their fathers, or other claimants of their estates, and there is no danger of encouraging the fabrication of spurious claims so long as strict proof of paternity is insisted upon."/

The foregoing views are not in harmony with the principles declared in the elaborate opinion of Mr. Justice Rhodes in the case of *Pina* v. *Peck*, 31 Cal. 359, and upon which decision appellants in the main rest this branch of their case. It is not our intention to analyze the soundness of the legal principles there laid down, otherwise than may have been incidentally done in what we have already said. Still, we might be allowed to say, no authority of courts or men learned in the law is presented in that opinion to support the views there declared, although, as we have seen, authority is not wanting to the contrary. *Pina* v. *Peck*, 31 Cal. 359, is not authority in this case, for two sufficient reasons: 1. But four justices participated in the decision (Justice Sanderson not taking part), and two of these justices concurred alone in the judgment. This fact entirely destroys the effect of the decision as an authority upon any and all matters therein discussed. 2. Justice Rhodes says at the very inception of his opinion: " It is contended by the defendants that this provision of the statute is in derogation of the common law, and must, therefore, be strictly construed. That doctrine was announced and applied by the court in the estate of Samuel Sanford, and we are of opinion that the ruling is correct, beyond a doubt. *As a consequence resulting from the operation of this rule,* the acknowledgment must conform to the statute, and be complete in itself; that is to say, it must not require the aid of extrinsic evidence. When the parties are identified, and the instrument in

writing is produced and proven, the court must be able to say from the instrument that the person who signed it thereby acknowledged himself to be the father of the illegitimate child therein named." Thus this decision was expressly based upon strict and rigid rules of statutory construction, and as we have seen, those rules of construction have now been entirely displaced, as to the codes, by rules liberal and humane in their character. That decision being expressly based upon strict rules of construction, and strict rules of construction now being abolished, it cannot be said to be binding authority in a case which we are called upon to decide by an application of statutory rules of liberal construction. It is insisted that the following rule of construction, as declared by Judge Cooley in his Constitutional Limitations (p. 66), must be invoked in this case, to wit: "It has ever properly been held that the legislature, by enacting without material alteration a statute which has been judicially expounded by the highest court of the state, must be presumed to have intended that the same words should be received in the new statute in the sense which had been attributed to them in the old." There can be no question that if the rules of statutory construction were the same now as when *Pina* v. *Peck*, 31 Cal. 359, was decided, and the views there expressed had been adopted by a majority of the court, this principle of the construction of statutes would have controlling effect in this case, but it is equally true that if the rules of construction have been changed, such principle, in the very nature of things, could not maintain.

For the foregoing reasons, let the judgment be affirmed.

PATERSON, J., and SHARPSTEIN, J., concurred.

McFARLAND, J., concurring. — I concur in the judgment of affirmance, upon the ground that the plaintiff is the heir of the deceased under section 1387 of the code. But I dissent from the proposition that plaintiff was adopted by deceased under section 230.

Section 230 provides that "the father of an illegitimate child, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he be married, into his family, *and* otherwise treating it as if it were a legitimate child, thereby adopts it." There can be a compliance with this section only by doing the three things which it requires to be done, viz.: the father must publicly acknowledge the child; he must receive it into his family; and he must otherwise treat it "as if it were a legitimate child." Assuming that the deceased, in the case at bar, did the first of these three things, he certainly, in my opinion, did not do either of the other two. It is clear that he did not receive the plaintiff into his family; in fact, there is no pretense that he did so. He had no family, and therefore, of course, did not receive her into his family. It is said that as he had no family, he could not have received her into it; nevertheless, the fact remains that he *did not* do so, and therefore did not comply with the said section of the code. How can there be compliance with a statute in the absence of conditions contemplated by the statute, and absolutely necessary to give it effect? The provision of the code in question assumes the existence of a family; and it assumes that there may be a family in which there is no wife, because it provides that if there be a wife, she must consent to receive the illegitimate child into the family. Either a widower or a bachelor, as we all know, may have a family, viz., "a collective body of persons living together under one head or manager." In order to make the statute applicable, it is not necessary that there should be a living wife in the family. It might have provided that the child should be received into a family in which there was a wife; and in that event no reception into any other kind of a family would have been sufficient. But it does not so provide. The provision is, that the child must be received into the father's family, and that if there be a wife, she must consent. There must, however, be a family into which the child can be received; and when that condition is not present, the provision of

the code under discussion can have no operation. There
is no question here of strict or liberal construction. If
it were true that there ought to be a strained construc-
tion in favor of illegitimate, as against legitimate, chil-
dren (and the law would be just the same if legitimate
children were contestants), still, the statute would not
bear the tension by which plaintiff seeks to stretch it.
The language of the code seems to me plain; it provides
that under certain conditions an illegitimate child may
be adopted by certain acts, but when those conditions
do not exist, it cannot by such acts be adopted. And if
it be necessary to look beneath the plain language of the
section of the code in question to discover the intent of
the legislature when enacting it, there is no difficulty in
seeing it. It was clearly the intent, that, in the absence
of documentary evidence, the claims of asserted illegiti-
mate children should not succeed upon loose oral
statements about disjointed and uncertain acts and
declarations of deceased persons, but that there should
be such continuous and unequivocal acts as reception
into the family, and treatment there as legitimate chil-
dren, in the face of the world. One having no family
can adopt the other mode, and can, by a written ac-
knowledgment in the presence of a competent witness,
make his illegitimate child his heir, as provided in sec-
tion 1387 of the Code of Civil Procedure, or may provide
for it by will.

I am aware that in the opinion of the court delivered
in *In re Jessup*, 81 Cal. 408, views were expressed differ-
ent from those above stated; but they were not necessary
to the decision of that case, and mere *dicta*, and I think
incorrect. I concurred in that opinion; but as I was
thoroughly convinced that the facts in that case did not
bring it within the code, under any possible construc-
tion of it, I must have failed to consider as thoroughly
as I should have done the views above referred to.
Upon mature reflection, I am satisfied that they are
wrong.

Neither do I think that the deceased, in the case at bar,

complied with the third requirement of said section 230; he did not "otherwise treat plaintiff as if she were a legitimate child." To treat a child "as if it were a legitimate child" is to treat it as ordinary people usually treat their legitimate children, — considering their circumstances in life. Did the deceased do this? Can any one think that if plaintiff had been his legitimate child, born in lawful wedlock, he would not have treated her differently? Without reviewing the evidence here, I venture to say, that, considering all the circumstances, no instance can be found in modern civilized life where a father treated a legitimate child in the manner in which the deceased treated the plaintiff.

The case of the plaintiff here appeals, no doubt, strongly to human sympathies. The deceased was a millionaire, and had no legitimate children, and, so far as yet discovered, the plaintiff is his only illegitimate child. But the law would have to be applied just the same to a case where half a dozen legitimate children had been left a small estate, and a brood of asserted bastards were clamoring for half the patrimony. No doubt, illicit sexual relations sometimes impose hardships on innocent persons; but such is the result of all violations of law. The legislature could abolish all distinctions between legitimate and illegitimate children; but if it should do so, it would practically abolish marriage, and dethrone chastity as the queen of womanly virtues.

Upon the second branch of the case, I have come to the conclusion, after a good deal of doubt, that the letters written by the deceased, and testified to by one of the witnesses as having been written and signed in his presence, constituted a written acknowledgment by him that plaintiff was his illegitimate child, within the meaning of section 1387, and that such acknowledgment makes her his heir. There was some evidence to establish these facts, and therefore the findings of the court below must be taken as true. The argument is very strong that the section contemplates a formal written

instrument made for the express, deliberate purpose of complying with the law, and not a writing made without such present and deliberate intent. But as the language of the section is very broad, and does not upon its face present the condition contended for by appellants, I am disposed to consider their construction too narrow. Upon this ground I concur in the judgment.

The judgment of the court below proceeds upon the theory that plaintiff was adopted under section 230; but as the purpose of the action is to determine her heirship, and as the facts which make her an heir under section 1387 are found by the lower court, and as the result is practically the same under either section, I see no objection to affirming the judgment.

DE HAVEN, J., concurred in the foregoing opinion of Mr. Justice McFarland.

Chief Justice Beatty and Justice Harrison, being disqualified, did not participate in the foregoing decision.

Rehearing denied.

NOTE. — It was argued in the briefs of appellants' counsel to some extent, and has been presented to the court with great force in one of the petitions for a rehearing in this case, that the principles of international law bearing upon the question of legitimation by subsequent marriage cannot be invoked to support other kinds of legitimation provided for by statute. The argument presented — and it is the only argument that can be advanced against the position taken upon this question in the leading opinion — is, that the marriage being performed according to the law of the place of marriage, the mother thereupon takes the domicile of the husband, and the domicile of the illegitimate child, following the domicile of the mother, becomes the same as that of the father, and the domicile of the father and the child thus being the same, there is no obstacle whatever to prevent the personal law of the father from taking effect upon the illegitimate child./ This position is entirely overthrown when we pause a moment to consider that many jurists hold that it is the domicile of the father at the time of the birth of the child that controls as to its capacity for legitimation. If such be the fact, upon a subsequent marriage of the parents international law would look to the domicile of the father at the date of birth to determine the question of legitimation, and not to his domicile at the date of marriage. His domicile at the happening of these two events may have been entirely different, may have been within different and distinct sovereignties, and while the marriage would give a domicile to the child in the sovereignty

where the father then resided, it would be the law of the sovereignty where the father resided at the birth of the child that would effect the legitimation. Hence it would not be the law of the domicile of the child that effected the legitimation, but the law of the previous domicile of the father at the date of its birth, and for that reason appellants' position is not sound.

GAROUTTE, J.