CASIANO ET AL., PLAINTIFFS AND APPELLEES, *v.* LUCCHETTI,
DEFENDANT AND APPELLANT.

APPEAL from the District Court of Ponce in an Action of
Filiation.

No. 1412.—Decided June 19, 1916.

NATURAL CHILD — ACKNOWLEDGMENT — HOLOGRAPHIC WILL — AUTHENTIC ACT —
FRENCH LAW.—The French Civil Code does not regard a holographic will as
a solemn and authentic act by which a father expresses his intention to give
his child a status, but requires the father to appear before some public func-
tionary and execute the act when the child was not acknowledged at the
time of its birth.

ID.—FOREIGN CODE—EVIDENCE.—In order that a foreign code may be considered
at a trial it must be offered in evidence pursuant to the Law of Evidence.

ID.—AUTHENTIC ACT—HOLOGRAPHIC WILL—PROTOCOLIZATION—LOCUS REGIT AC-
TUM—FRENCH LAW.—An act which is not authentic under the laws of a
foreign country cannot become so under the principle of *locus regit actum*
by being carried to the protocol of a notary in Porto Rico by some other
person; and inasmuch as in France a holographic will need only be pub-
lished by the judge of the place where it was made, its protocolization in
Porto Rico does not make it authentic.

ID.—FOREIGN RESIDENCE—LOCUS REGIT ACTUM—FRENCH LAW—HOLOGRAPHIC
WILL—PROTOCOLIZATION—DEFECT IN FORM.—The French Civil Code contem-
plates the right of its citizens residing temporarily in foreign countries where
the intervention of a public official in the making of a will is unnecessary
to its validity to do the equivalent thing in such countries; but unless the
will is made according to the formalities of the foreign country the principle
of *locus regit actum* does not apply and the protocolization of a will does
not make it an authentic document.

ID.—LEGITIMATION—ACKNOWLEDGMENT—INTERNATIONAL LAW.—It is a familiar
principle of private international law that a child legitimated in the country
of its father will be considered legitimate elsewhere; and if an acknowl-
edged natural child is legitimated in this manner in a particular country, it
will receive due recognition in another jurisdiction.

ID.—FILIATION—HOLOGRAPHIC WILL—VOLUNTARY ACT.—In an action of filiation
in which the status of natural child is sought to be conferred in a holographic
will, the act of the father, even when voluntary, must be determined by
the law of the country to which he belongs and which he is presumed to
know.

ID.—ACKNOWLEDGMENT—HOLOGRAPHIC WILL—PUBLIC ORDER.—If a French citizen
domiciled in France makes a holographic will acknowledging children had
by him while temporarily residing in Porto Rico, there can be no question
of public order. Spanish legislation adopted the law of nationality in family

matters for its own citizens and there is no reason of public order for sub-
jecting a Frenchman, although perhaps domiciled in Porto Rico, to any law
but that of his own country.

The facts are stated in the opinion.

*Mr. A. F. Castro* for the appellant.

*Messrs. José* and *Manuel Tous Soto* for the appellees.

MR. JUSTICE WOLF delivered the opinion of the court.

Tristán Lucchetti died in Paris, France, on February 12,
1897, being a French citizen residing in Yauco, Porto Rico.
He was a bachelor and left no legitimate heirs in the ascend-
ing or descending line. On August 20, 1896, and hence a few
months before his death, he left a holographic will naming
his brother, Mateo Lucchetti, his universal heir, with a spe-
cial clause as follows:

"I leave the 14,000 *pesos,* provincial money, in equal shares to
my natural son, born April 1, 1895, of my concubine Justa, whom
you know, and to another child to which she will give birth as I
have left her pregnant. This money is not to be delivered to the
children (7,000 *pesos* to each child of which they must give to their
mother 1,000 each) until they have reached the age of eighteen
years. In the meantime you will use the interest at 5 per cent
annually in providing for their necessities and in supporting their
mother, and also in having the children given a good elementary
education so that when they are grown they may be able to make
good use of their small capital. Love them and be kind to them in
my memory. If either of them should die before reaching the age
of eighteen years, one-half of his part shall go to the survivor and
the other half to you. If both of them should die, all shall belong
to you, except the sum of two thousand *pesos,* which in any case
is allotted to the mother."

In form the will was a letter directed to his said brother,
and the testator made other bequests. On the death of Tris-
tán, his brother took the will and caused it to be formally
protocolized in the office of Notary Matienzo Cintrón. On
February 17, 1915, the said Mateo Lucchetti paid to said chil-
dren named in the will and legally emancipated by the Dis-
trict Court of Ponce the amount of their said legacies—7,000

*pesos* each; and the said emancipated children accepted the same and thereafter on February 24, 1915, filed the present suit.

The right of filiation claimed in this suit is principally dependent upon the clause of the will which we have set forth. In consequence of their alleged right to be the acknowledged natural children of Tristán, they also claim a right to receive the difference between what would be their special portion as forced heirs and the amount actually paid them. It seems to be conceded that the amount of such legitimate portion would have to be determined by French law, and it also seems to be the fact that the amount they actually received as legacies would have practically satisfied their legal portions if such portions were to be determined by the Porto Rican law; in other words, the estate of Tristán amounted to 42,888.50 *pesos* and the natural acknowledged children, under the code then in force, would have been entitled to one-third thereof. Under the French law, a brother living, the said natural children would have been entitled to three-fourths of the amount that legitimate children would have received, namely, three-fourths of two-thirds, or one-half. The difference between the legacies and the amount claimed is approximately 7,000 provincial *pesos* and interest.

There was proof of experts and citation of French law sufficient to show that in France a holographic will of this kind would not give a natural child living in France the status of an acknowledged natural child. The French law does not regard a holographic will as the solemn and authentic act by which a father expresses his intention to give his child a status. That law requires the appearance of the father before some public functionary when the child has not been acknowledged at the time of its birth. Authenticity is the rule in France.

The appellees in substance admit that the holographic will in itself would not avail in France, but they lay great stress on the fact of its protocolization in Porto Rico.

Section 1317 of the French Civil Code is as follows:

*"L'acte authentique est celui qui a été reçu par officiers publics ayant le droit d'instrumenter dans le lieu ou l'acte a été redigé, et avec les solemnités requises,"*

which translated means:

"An authentic act is one which has been attested by a public functionary who is authorized to discharge such duties in the place in which the act was executed, and under the required solemnities."

The appellees also present in their brief section 1322 of the French Civil Code:

*"L'acte sous seing privé, reconnu par celui auquel on l'oppose, ou legalement tenu pour reconnu, a, entre ceux qui l'ont souscrit et entre leurs héritiers et ayant-cause, la meme foi que l'acte authentique."*

The judge below certified that all the evidence was copied into the statement of the case, but we do not find that section 1322 was offered in evidence, as is necessary for foreign codes. We have looked carefully in the record because the quotation was not very clear to us as cited in the brief of the appellees, either in French or Spanish. The Spanish version is as follows:

*"El documento privado reconocido por aquel a quien se opusiere o legalmente tenido por reconocido, tiene entre los que lo suscribieron y sus causahabientes el mismo efecto que el documento auténtico,"*

which translated means:

"A private document acknowledged by one to whom it may be opposed, or legally considered as acknowledged, has the same effect among those who signed it and their successors in interest as an authentic document."

Now, these words may perhaps mean that if the person who claims a right under the document admit the authenticity of the same, the said document shall be considered authentic, but it might mean a number of other things. For

greater safety we have examined the French code and we are inclined to think that the section cited refers to the effect of private documents between parties, and that it was not the intention of making this section an equivalent of an authentic act. The court below apparently did not rely on this section, nor do the appellees, if we understand them, maintain that the act of the defendant in protocolizing the will was the authentic act, or the substitution therefor, to which section 1322 refers. There is, however, a decision of the Court of Appeals of Paris, specially mentioned hereafter, which is copied into the record and which denies authenticity to a holographic will under which the complainants in a suit were claiming, and hence we conclude that section 1322, even if it were duly before us, has not the effect of substituting a holographic will for the authentic act to which section 1317 refers.

The appellees were maintaining that the protocolization in Porto Rico of the will of a person domiciled in Porto Rico would make it an act done before a public official, and that under the principle of *locus regit actum,* as the domicile of the deceased and the property were all to be put into effect in Porto Rico, the local rules must apply. But we are unable to see how an act which is not authentic under the laws of a particular country, and which requires the appearance of a person before a public functionary, can become authentic because the particular act or document is carried to the protocol of a notary by some other person. As Tristán was a Frenchman and as in France a holographic will need only be published by the judge of the place where made, we doubt if the protocolization before the notary in Porto Rico was not superfluous. The decision of the French court, to which we have referred, declared that the acknowledgment in a holographic will would have no force under the French law and that it could not avail as an English will and public act because it was not duly witnessed. Report by Dalloy,

Compilation of Jurisprudence, etc., 1897, Part 2, p. 339. In other words, it could never be offered to probate in British courts as a valid will and hence did not fall under the provisions of section 999 of the French Civil Code, which permits a Frenchman to make a valid will according to the forms of a foreign territory. The will was invalid *ab initio* as a will under the English law, but valid as holographic under the French law. In other words, under the principle of *locus regit actum* the French court would have given force to the acknowledgment of the testator if he had followed the form for a valid will under English law. In the case before us the will was made in France and the only *locus* applicable was Paris. If the testator had made a holographic will in Porto Rico, with the formalities required for it here, a different question might be presented; but even then we might doubt. What the French law contemplates is the right of its citizens, if they are temporarily in England or the United States or other countries where the intervention of a public official in the making of a will is unnecessary, to do the equivalent thing in such countries. Very formal is the requirement of the English law in these cases. The witnesses must have come at the request of the testator; they must see him sign, attest his signature and sign in the presence of the testator and of each other. All this appears from the French opinion copied into the record. The appellees are mistaken in thinking that the question of the probate of the will is the important part to be considered on the question of a valid English will. Even if the will had been accidentally admitted to probate, it would never have been a valid will at all if the witnesses merely signed without the other requisites we have pointed out. The defects were not merely formal; they prevent the supposed last act of a man from becoming a valid will and testament. Pasquale Fiore in his work on Private International Law (Madrid Edition, 1889), Vol. III, page 744, touches upon the question of how the French courts

will give validity to an act done in foreign territory, as follows:

"We can only concede that, if in consequence of the action brought in the foreign court where the child was born and where he acquired the civil condition of natural child of a certain person with the possession of the status the said condition was judicially established, this judgment may serve to establish the status of natural filiation even in the country of the father where the possession of the status is not considered sufficient for this purpose. The reason upon which this is based is that according to the laws of Italy, for example—and the same is true as to those of France—authenticity is an indispensable requisite to establish the acknowledgment, but it is not required that the act be performed for the principal purpose of showing the paternity and filiation; wherefore the acknowledgment made incidentally in an authentic document by simple but unmistakable expressions is considered valid, as is also a judicial acknowledgment approved by the court.

"Now, just as the foreign judgment has the character of authenticity, so also when by means thereof the paternal filiation is established by the possession of the status and this is recognized in an action against the father, it is equivalent to an explicit judicial confession on the part of the father and is sufficient to give to the acknowledgment the character of authenticity which our laws require."

And in the previous paragraph he gives it as his opinion that the principle of *locus regit actum* would be invoked in vain to give a child a valid status not given by the law of the father's domicile.

The real and important question in this case is whether the French law or the Porto Rican law in force in 1897 should prevail. Tristán Lucchetti was a French citizen domiciled or residing in Porto Rico. The children were living in Porto Rico and, until the making of the will at least, were Spanish subjects. The French law and the Spanish law are in conflict. As pointed out by Fiore, *supra,* section 723, there can be no relation established for the child which does not establish the reciprocal relation for the father. Which law is to be given effect?

The testator died in 1897 and all the acts relating to the protocolization and otherwise were done before the change of sovereignty from Spain to the United States took place; hence we think, for this reason alone, the decisions of this, court in the cases of *Marimón* v. *Pelegrí,* II S. P. R. 331, and *Cruz* v. *Domínguez,* 8 P. R. R. 551, have no application; but we agree also with the appellant that the decisions of this court in divorce matters, wherein a special policy was developed by our court, have no application to a general principle of private international law.

Articles 9, 10 and 11 of the Spanish Civil Code, in force at the time, are as follows:

"Art. 9.—The laws relating to family rights and obligations, or to the status, condition, and legal capacity of persons, obligate Spaniards even though they reside in a foreign country.

"Art. 10.—Personal property is subject to the laws of the nation of the owner thereof; real property to the laws of the country in which it is situated.

"However, legal and testamentary successions, with regard to the order of succession, as well as to the amount of the successional rights and to the intrinsic validity of their provisions, shall be regulated by the laws of the nation of the person whose succession is in question, whatever may be the nature of the property and the country where it may be situated.

"Biscayans, even though they reside in towns, shall continue subject, with regard to the property they possess in the level lands, to law 15, title 20 of the *Fuero de Vizcaya.*

"Art. 11.—The forms and solemnities of contracts, wills, and other public instruments are governed by the laws of the country in which they are executed.

"When said instruments are authenticated by diplomatic or consular officials of Spain abroad, the formalities required by Spanish laws for their execution shall be observed.

"Notwithstanding the provisions of this and of the preceding article, prohibitive laws concerning persons, their acts or property, and those which relate to the public order and to good morals, shall not remain without effect by virtue of laws issued or judgments rendered, or by regulations made or conventions agreed upon in a foreign country."

The courts of the Continent, by reason of the provisions of article 9, have always, by a principle of comity or reciprocity, applied to a foreigner the laws of his own country. In the case of *Colón* v. *The Registrar of Aguadilla*, 22 P. R. R. 344, this court dwells on this principle of reciprocity. We think that that case, also relied on by the appellees, has a general tendency against them. It was one of the exceptions that tended to prove the rule. We say there that in matters affecting real estate we shall follow the principles of private international law laid down in the United States. But that decision goes no further, and, indeed, it is intimated there that but for a change made at the instance of the Code Commission our courts might have been bound to follow the provisions of the Spanish Civil Code.

On the other hand, we do not think that the decision of the Supreme Court of Paris would throw any light on the principal question in this case, because in this French case there was no question between two jurisdictions wherein by the law of one a child became the acknowledged natural child and by the law of the other it did not. Neither by the law of England nor by the law of France would the children mentioned in the said will have received a new status.

It is, however, a familiar principle of private international law that a child legitimated in the country of its father will be considered legitimate elsewhere; and an acknowledged natural child, if legitimated in this form in a particular country, will receive due recognition in another jurisdiction, and it will be seen hereafter that the legitimation in question includes acknowledgments.

Neither of the parties in this case have cited any of the decisions of the American courts. However, in the United States these questions of private international law are constantly arising. Very early in the jurisprudence of the United States it became necessary to say that the law of the domicile of a person should determine his status or his personal obligation, as the case may be. But the question of

the status of a child depends upon the exercise of the will of his father in France and generally so in the United States. Generally, the investigation of the paternity of a child is forbidden. Now, so far as an act is voluntary we think the authorities are perfectly clear that the construction to be put upon a particular act or an instrument must be governed by the law of the father's country or domicile,. as the case may be. In the United States the principle of domicile has been substituted for the principle of nationality; but, bearing this distinction in mind, the precedents of Amercan courts are applicable. There are sometimes in various states of the United States wider differences in regard to family matters than exist between France and Spain. The question whether a man is a citizen of a particular state is principally a matter of domicile, and hence the laws of the various states produce similar conflict to this that exists between citizens of various countries. For example, *Blythe* v. *Ayres,* 96 Cal. 532, 19 A. R. 40, was a case where the father was a citizen of California; the child and its mother were living in England. Under the law of California a father's acts in acknowledging a child and receiving it into his family constitute an acknowledgment. The child is supposed to acquire the status immediately. The court held that the Californian law was applicable. On the other hand, in *Irving* v. *Ford,* 65 L. R. A. 177, the father of the child was domiciled in Massachusetts, having originally been domiciled in Virginia where the father and mother of the child were both slaves. Virginia passed a law making the children of such slave marriages legitimate, but at that time the father of the child was domiciled in Massachusetts. The Massachusetts court held that a Massachusetts law not only required the marriage of the parents, but an express acknowledgment and, therefore, that the child had never become legitimate. In this case the Massachusetts court cites the case of *Blythe* v. *Ayres, supra.* The court speaks, among other things, of the legitimation of a child. In other words, the use of the word "legitimation" applies

to acknowledgment as well, or any act giving the child a status. For these questions of status the rule generally applied is that the law of the domicile of the father must prevail. Fiore, *supra*, p. 720 and following; 5 Ruling Case Law, 920; *Blythe* v. *Ayres,* 96 Cal. 532; 11 L. R. A. 40; *Irving* v. *Ford,* 65 L. R. A. 177.

We should have no doubt whatever in this case if this suit merely assumed that the holographic will of the father gave the complainants here a status in itself. It would then be perfectly clear to us that so far as the giving of a status was dependent upon the voluntary act of the father, such voluntary act must be determined by the law of the country to which he belonged and the laws which he must be presumed to know. But a somewhat different question is presented under a law which gives the child a right to compel his father to acknowledge him. Article 135 of the Spanish Civil Code, in force in Porto Rico in 1897, provided:

"The father is obliged to acknowledge the natural child in the following cases:

"1. When an indisputable paper written by him, expressly acknowledging his paternity, is in existence.

"2. When the child is in uninterrupted enjoyment of the status of a natural child of the defendant father, justified by direct acts of the said father or of his family.

"In cases of violation, ravishment, or rape, the provisions of the Penal Code shall be observed with regard to the acknowledgment of the issue."

In other words, the Spanish Civil Code applicable to the facts of this case, if at all, recognized the right of a child to compel his natural father to recognize him under given conditions. These conditions may be proved to show the paternity of the child, while in France all and every investigation of paternity is forbidden in the absence of an authentic recognition by the father. The judge of the court below based his decision largely on the fact that the law of Porto Rico must govern for reasons of public order, as set out in

article 11 of the Civil Code; and he places some reliance on the cases of *Marimón* v. *Pelegrí* and *Cruz* v. *Domínguez, supra.* Further distinguishing these cases, we may say that no right of a foreigner other than a Spaniard was involved and, also, that the institution of absolute divorce is a matter which the law itself has regulated as a matter of domicile.

In trying, then, to arrive at the question whether the acknowledgment of a natural child is a matter of public order, we think we must begin afresh. As the appellant points out, it is the public policy of some places to permit the acknowledgment of natural children, while other places do not permit it at all. The most general policy in the United States is to give natural children no rights as against their fathers. Only a few states have done so. Where there has been a conflict of laws in the matter of legitimation it has generally been by reason of the subsequent marriage of the parents. We have not only to consider on the question of public order the rights of acknowledged natural children as between places that legitimate children in this way, but also of places which do not permit such legitimation. For example, if an Englishman is domiciled in Porto Rico, could he be compelled to acknowledge a natural child when by his proper law no such legitimation is possible? A number of Porto Ricans are actually domiciled in the United States and have never acquired citizenship. If such Porto Rican made a public acknowledgment of a natural child that he had while temporarily in Porto Rico, would he be governed by the law of Porto Rico or by the law of the place where he was domiciled? Section 9 of the Civil Code distinctly says that such a person would be governed by the law of Porto Rico. Under the decisions it would seem likely that if a man domiciled in New York acknowledged a child domiciled in California, the heirs of the New York man could successfully contest such an acknowledgment. As pointed out in the Colón case, we must be governed partially by the attitude from which the courts which review our decisions would

regard the matter in point. As intimated before, we think that the United States courts, as they have done before, would substitute for the question of domicile in the case of a native United States citizen, the question of nationality when it came to a foreign subject. We are aware, of course, that the jurisprudence of the United States which says that no status could be imposed upon the father *in invitum,* could have no application to article 135 of the Spanish Civil Code, which in terms says that the father "may be compelled." The appellees maintain that this provision of the Spanish Civil Code is a sort of penalization, and that no man may become domiciled in Porto Rican territory and seek to escape the responsibility for the acts specified in that article.

The acts for which a father may be compelled to acknowledge a child do not differ very much in kind from the acts by which a status is immediately created under articles 131 *et seq.* of the Spanish Civil Code. They all lead to the creation of a new status with the consequent rights of succession or forced heirship. It would seem that if the legislature had desired to put something in the nature of a penalty on foreigners domiciled within its territory, it would have expressed itself more specifically. On the contrary, the intendment of article 9 is on the principle of reciprocity that the foreigner domiciled in Porto Rico should, nevertheless, be governed by the law of his nation. If we are to judge of the general and necessary consequences of an acknowledgment they generally involve property rights. In other words, the effect of the judgment of a court declaring a child a natural acknowledged child is to make him the heir of his father. Fundamentally, are no other rights involved than the question of rights of succession and heirship? It is true that the right to claim support from a living father is also involved, but that this expression of the Civil Code should be construed into a quasi-police regulation seems extremely dubious.

If a French citizen domiciled in Porto Rico publicly ac-

knowledges a child or does any of the things mentioned in article 135, if that child gets a judgment against its father, *ipso facto* he becomes a French citizen. This is also a consideration to determine whether the legislator in article 135 meant to make a provision of public order.

If articles 9, 10 and 11 of the Spanish Civil Code are examined it will be seen that article 11, when it refers to public order, only mentions itself and the preceding article. In other words, article 9 is not specifically referred to. It is article 9 that determines family rights. Section 13 of the Porto Rican Civil Code says that when a law is free from ambiguity its letter should not be disregarded under the pretext of fulfilling its spirit.

As this alleged right to compel a father to acknowledge his natural child is only a mode of acquiring a status, we find no reason to distinguish it from the other modes when it comes to a question of what is the law to be applied. If, for example, Tristán had been actually domiciled in France and had made his holographic will acknowledging two children had by him while temporarily residing in Porto Rico, there could be no question of public order. In view of the fact declared that Spanish legislation has adopted the law of nationality in family matters for its own citizens, we see no reason of public order for subjecting a Frenchman, although perhaps domiciled in Porto Rico, to any law but that of his own country.

The judgment must be reversed and the complaint dismissed without special imposition of costs.

*Reversed.*

Chief Justice Hernández and Justices Aldrey and Hutchison concurred.

Mr. Justice del Toro dissented.